DLA PIPER LLP (US)
Norman Leon (pro hac forthcoming)
Norman.leon@dlapiper.com
444 West Lake Street, Suite 900
Chicago, IL 60606-0089
T. 312.368.4000

DLA PIPER LLP (US)
Karen C. Marchiano (SBN 233493)
karen.marchiano@dlapiper.com
2000 University Ave.
East Palo Alto, CA 94303-2214
T. 650.833.2000

BRYAN CAVE LEIGHTON PAISNER
Jonathan C. Solish (CA SBN 67609)
Jonathan.solish@bclplaw.com
120 Broadway, Suite 300
Santa Monica, CA 90401-2386 USA
T: 310.576.2100

Attorneys for Plaintiff
INTERNATIONAL FRANCHISE ASSOCIATION

GRANT NIGOLIAN, P.C.
Grant A. Nigolian (CA SBN 184101)
grant@gnpclaw.com
695 Town Center Drive, Suite 700
Costa Mesa, CA 92626
Tel: 310.853.2777

MARKS & KLEIN LLP
Justin M. Klein (pro hac vice forthcoming)
justin@marksklein.com
Andrew P. Bleiman (pro hac forthcoming)
andrew@marksklein.com
63 Riverside Avenue
Red Bank, NJ 07701
Tel: 732.747.7100

Attorneys for Plaintiffs
INTERNATIONAL FRANCHISE ASSOCIATION,
ASIAN AMERICAN HOTEL OWNERS
ASSOCIATION, THE SUPERCUTS
FRANCHISEE ASSOCIATION, and the
DD INDEPENDENT
FRANCHISE OWNERS ASSOCIATION

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERNATIONAL FRANCHISE ASSOCIATION, ASIAN AMERICAN HOTEL OWNERS ASSOCIATION, SUPERCUTS FRANCHISEE ASSOCIATION, and the DD INDEPENDENT FRANCHISE OWNERS ASSOCIATION,<br><br>Plaintiffs,<br><br>v. | CASE NO. '20 CV 2243 BAS DEB<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

STATE OF CALIFORNIA; XAVIER
BECERRA, IN HIS OFFICIAL
CAPACITY AS ATTORNEY GENERAL
FOR THE STATE OF CALIFORNIA;
JULIE SU, IN HER OFFICIAL
CAPACITY AS LABOR
COMMISSIONER OVER THE DIVISION
OF LABOR STANDARDS
ENFORCEMENT; LILIA GARCIA-
BOWER, LABOR COMMISSIONER OF
THE CALIFORNIA DEPARTMENT OF
INDUSTRIAL RELATIONS; KATIE
HAGEN, DIRECTOR OF THE
DEPARTMENT OF INDUSTRIAL
RELATIONS; and PATRICK HENNING,
DIRECTOR OF THE EMPLOYMENT
DEVELOPMENT DIVISION,

Defendants.

Plaintiffs, the International Franchise Association (the "IFA"), the Asian American Hotel Owners Association ("AAHOA"), the Supercuts Franchisee Association ("SFA") and the DD Independent Franchise Owners Association ("DDIFO"), as and for their Complaint against Defendants, allege as follows:

## INTRODUCTION

1.      The IFA, AAHOA, SFA and DDIFO (collectively, "Plaintiffs") bring this lawsuit to enforce its federal rights as provided by federal statute and guaranteed by the Supremacy Clause of the United States Constitution.   The Plaintiffs seek declaratory and injunctive relief prohibiting Defendants from enforcing against franchisors and franchisees (as those terms are defined under 16 C.F.R. § 436.1(i) and (k)) California's new test for determining whether a worker is an employee or independent contractor, as interpreted by the California Supreme Court in *Dynamex Operations West, Inc. v. Superior Court*, 4 Cal. 5th 903 (2018) ("*Dynamex*") and

COMPLAINT

EAST\177538368.1

subsequently codified by the California Legislature through Assembly Bill 5 ("AB-5") and Assembly Bill 2257 ("AB-2257") ("California's ABC Test").

2.      Franchising has "existed in this country in one form or another for over 150 years" (*Patterson v. Domino's Pizza, LLC*, 60 Cal. 4th 474, 489 (2014)), and, more recently, has "become a ubiquitous" and "thriving business model." *Id*. at 477. Under this business model, the franchisor, "sells the right to use its trademark and comprehensive business plan" to franchisees who "independently own[], run[], and staff[] the retail outlet that sells goods under the franchisor's name." *Id.*

3.      Franchised businesses currently operate in more than a hundred different business sectors.  In addition to industries in which franchising has long been prevalent, such as automotive repairs and services, hotels and motels, quick-service and full-service restaurants, tax preparation businesses and real estate brokerages, franchised industries also include, among many others, home health care and senior care, home repair and remodeling, package shipping, hair care, fitness, financial services, childcare, tutoring, and swim schools.

4.      The entities that choose to operate franchised businesses are as varied as the types of businesses that have chosen to franchise their business models.  While a large segment of franchisees are individual entrepreneurs seeking to own and operate their first business, many franchisees have grown into immense operations with tens of thousands of employees and hundreds of locations.  Many operate multiple brands. Still other franchisees are public companies.  In light of its enormous growth, franchising has a profound effect on the economy, both nationally and in the State of California.  In 2019, in California alone, there were more than 82,600 independently owned and operated franchised businesses. These franchised businesses collectively generated more than $82.9 billion in economic output.

EAST\177538368.1

5.      Further, franchisees are significant job creators in their communities.  In 2019, franchisees in this State employed almost 827,000 people, and collectively generated $35.3 billion in payroll.

6.      Franchisors and franchisees share the common goals of success and survival.  Matters which restrict or undermine franchisors will invariably have an equal or greater detrimental effect on franchisees (who rely heavily on the franchisor's brand and systems for operation) and the nearly 827,000 people employed by franchised businesses in this State.

7.      Franchising offers a wide array of individuals the opportunity to develop, own, and operate their own businesses and, as such, franchising represents for many Americans a piece of the American Dream.  This is especially true for those whose education level or other characteristics could pose barriers in other industries.

8.      Franchising is also a statutorily recognized and permissible method of doing business.  Without exception, all of the statutes that regulate franchising recognize that the relationship between a franchisor and its franchisees is a commercial relationship, not an employment relationship.  Importantly, the Federal Trade Commission ("FTC"), which authorizes and regulates the sale of franchises in the United States, defines a "franchise" in part as "any continuing *commercial* relationship or arrangement" whereby the franchisor promises that the franchisee "will obtain the right *to operate a business* that is identified or associated with the franchisor's trademark ...." 16 C.F.R. § 436.1(h)(1).  (16 C.F.R. § 436 *et seq.* is hereinafter the "Franchise Rule").

9.      The FTC Franchise Rule defines a "franchise" as "any continuing commercial relationship or arrangement, whatever it may be called, in which the terms of the offer or contract specify, or the franchise seller promises or represents, orally or in writing, that ... [t]he franchisor *will exert or has authority to exert a significant degree of control* over the franchisee's method of operation, or provide

COMPLAINT

EAST\177538368.1

significant assistance in the franchisee's method of operation." 16 C.F.R. § 436.1 (emphasis added).

10. Likewise, the FTC Franchise Rule requires that a franchisee receive from the franchisor "the right to operate a business that is identified or associated with the franchisor's trademark, or to offer, sell, or distribute goods, services, or commodities that are identified or associated with the franchisor's trademark." 16 C.F.R. § 436.1. And, the federal statute which permits the licensing of trademarks (the Lanham Act) *mandates* that trademark licensors maintain control over the use of their trademarks. *See* 15 U.S.C. §1127 (2000). In fact, "[w]here a licensor fails to exercise adequate quality control over a licensee, a court may find that the trademark owner has abandoned the trademark, in which case the owner would be estopped from asserting rights to the trademark." *Barcamerica Int'l v. Tyfield Importers, Inc.*, 289 F.3d 589, 595 (9th Cir. 2002).

11. These controls, however, are not just intended to protect a franchisor's system or the value of its trademarks. Because "uniformity of product and control of its quality cause the public to turn to franchise restaurants" (*Burger King Corp. v. Stephens*, 1989 WL 147557, at *12 (E.D. Pa. Dec. 6, 1989)), the value of the brand a franchisee chooses to affiliate with is directly impacted by a franchisor's ability to maintain consistency and quality. "By following the standards used by all stores in the same chain, the self-motivated franchisee profits from the expertise, goodwill, and reputation of the franchisor." *Patterson*, 60 Cal. 4th 477. A satisfactory experience in one franchised location may encourage a consumer to visit that location again, or, critically, other locations in the system that offer the same satisfactory experience. Conversely, consumer dissatisfaction with an experience at a single franchised location can be attributed to the franchise system as a whole. Therefore, the standards a franchisor is required to establish greatly impact and help protect a franchisee's investment and the equity it has built in its business.

12.     Franchisors, franchisees, and franchisees' employees who work in franchised businesses all derive mutual benefit from this unique, controlled, and codified "business relationship".  *See, e.g.*, Cal. Corp. Code §31001; §31005(a)(2); *and* §31011.

13.     A franchisor's controls over system standards help protect the interests of consumers.  By establishing and enforcing standards for operational matters like cleanliness, food storage and preparation, and safety, franchisors not only protect the expectations of consumers who choose to patronize franchised businesses, but help ensure that guidelines are put in place to protect their health and safety.

14.     The FTC Franchise Rule is logically consistent in treating franchise relationships and employment relationships as mutually exclusive – *i.e.* a franchise is not an employment relationship.

15.     The California Legislature has enacted two statutes to regulate franchise relationships in this State (the California Franchise Investment Law [the "CFIL"] and the California Franchise Relations Act [the "CFRA"]).  These statutes have co-existed with the Lanham Act for almost 50 years because they contain similar definitions of the "franchise" relationship and, thus, are legally compatible.  Like the FTC's Franchise Rule, these enactments repeatedly characterize franchises as "businesses" and describe the relationship created between a franchisor and a franchisee as a "business relationship." *See, e.g*., Cal. Corp. Code §31001 (disclosures are designed to give a better understanding of the parties "business relationship"); §31005(a)(2) ("[t]he operation of the franchisee's business" must be substantially associated with the franchisor's trademark); §31011 (franchise fee is the amount paid "for the right to enter into a business under a franchise agreement").

16.     For clarity, it is not suggested in any manner that the CFIL, the CFRA or any other state statute that deals with franchising is somehow preempted, or inconsistent with, the FTC Franchise Rule or the Lanham Act.

COMPLAINT

17.     California's ABC Test, however, is irreconcilable with the federal laws that regulate franchising and the trademark license underlying all franchised businesses.  The ABC Test impermissibly impinges on the essential feature of the franchise model—control over brand-specific systems and business models. Without control, franchisors would be forced to abandon their required support and system oversight, resulting in harm to both franchisees and consumers.

18.     Prong A of California's ABC Test, which requires a showing that workers are entirely free from the control of the hiring entity in connection with the performance of work both under contract and in fact, threatens to convert all franchise relationships into employment relationships, and thus conflicts with and undermines the federally approved franchise business model.

19.     Specifically, under Prong A of the ABC Test, a person may not be classified as an independent contractor unless that person is "*free* from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact."  Cal. Labor Code § 2775(b)(1) (emphasis added).  As such, the ABC Test, if strictly interpreted to apply to a franchisor-franchisee relationship, would have the perverse effect of converting all franchise relationships, which necessarily require some element of control as defined by the FTC Franchise Rule, into employment relationships despite those relationships being arms' length and governed by contract.

20.     Similarly, under Prong B of the ABC Test, a person may not be classified as an independent contractor unless that person "performs work that is outside the usual course of the hiring entity's business."  Cal. Labor Code 2775(b)(1)(B).  By definition all franchisees are granted the right to operate a business that is identified or associated with the franchisor's trademark."  16 C.F.R. 436.1(h).  If operating a business identified or associated with the franchisor's trademark (or offering, selling, or distributing goods, services, or commodities that are identified or associated with

EAST\177538368.1

the franchisor's trademark) is considered performing work that is within the usual course of the franchisor's business, and the ABC test otherwise applies to franchisees, then franchisees (under federal law) would be employees under the ABC Test.

21.     Recently, this dissonance between the ABC Test and the franchise business model was emphasized by the United States District Court for the District of Massachusetts.  In the case of *Dhananjay Patel v. 7-Eleven*, Inc., No. 1:17-cv-11414-NMG. (Sept. 10, 2020), the District Court correctly identified the "inherent conflict" between the FTC Franchise Rule and Massachusetts' version of the ABC Test, which mirrors California's version of the ABC Test.  The Court stated that: "It cannot be the case, as plaintiffs suggest, that, in qualifying as a franchisee pursuant to the FTC's definition, an individual necessarily becomes an employee.  In effect, such a ruling by this Court would eviscerate the franchise business model, rendering those who are regulated by the FTC Franchise Rule criminally liable for failing to classify their franchisees as employees."  *Patel,* 2020 U.S. Dist. LEXIS 165057, at *24.

22.     As noted above, Prong A of California's ABC Test requires that a person be "*free from control* and direction in connection with the performance of the service, both under his contract for the performance of service and in fact."  Cal. Labor Code § 2775(b)(1) (emphasis added).  This cannot be reconciled with the FTC Franchise Rule.  Specifically, the FTC Franchise Rule precludes satisfaction of Prong A exactly in the manner identified by *Patel* because the FTC Franchise Rule *defines* a franchise as a relationship in which "the franchisor *will exert or has authority to exert a significant degree of control* over the franchisee's method of operation …."  *Patel*, 2020 U.S. Dist. LEXIS 165057, at *19 citing 16 C.F.R. § 436.1 (emphasis added).

23.     The ABC Test thus stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, including the authorization and regulation of the sale of franchises and the licensing of trademarks in connection therewith.

EAST\177538368.1

24.    For these and the additional reasons set forth below, Plaintiff seeks a declaration that California's ABC Test as applied to franchisors and franchisees is preempted by the FTC Franchise Rule and the Lanham Act, and a corresponding injunction prohibiting Defendants from enforcing California's ABC Test against franchisors and franchisees.

## JURISDICTION AND VENUE

25.    This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331, in that this action arises under the Constitution and laws of the United States, including the Supremacy Clause (U.S. Const. Art. VI), the Lanham Act (15 U.S.C. § 1051, *et seq.*), and the FTC Franchise Rule (16 CFR § 436.1, *et seq.*).  This Court also has subject matter jurisdiction over this matter under 28 U.S.C. § 2201 in that this is a proceeding for declaratory judgment and injunctive relief under 28 U.S.C. §§ 2201-2202 and the Supremacy Clause of the United States Constitution. This action presents an actual controversy within the Court's jurisdiction.

26.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) Plaintiffs' members entered into franchise agreements that contemplate performance in this judicial district, such that a substantial part of the events giving rise to the claims occurred in this judicial district.

## PARTIES

27.    The IFA is the world's oldest and largest organization representing the franchising industry.  Since 1960, it has educated franchisors and franchisees on beneficial methods and business practices to improve franchising.  It also advocates on behalf of franchisors and franchisees.  Through its educational, public-policy, and government-relations programs, it furthers the interests of the more than 733,000 franchise establishments which span over 300 different industries, support nearly 7.6 million jobs, and contribute more than $674 billion to the U.S. economy.  Its members operate in all 50 states, including California.

EAST\177538368.1

28.     AAHOA is the largest hotel owners' association in the nation.  AAHOA's more than 19,500 members own almost one in every two hotels in the United States. With billions of dollars in property assets and hundreds of thousands of employees, AAHOA's members are core economic contributors in virtually every community. AAHOA's mission is to advance and protect the business interests of hotel owners through advocacy, industry leadership, professional development, member benefits, and community engagement.

29.     Supercuts Franchisee Association ("SFA") represents over 1500 salons across the United States, including in the State of California. Founded in 1985, SFA is dedicated to enhancing the personal and professional lives of its members through education, leadership development, best practice sharing and advocacy in the franchising and Salon Industries. The SFA is a founding member of the Washington, D.C. based Coalition of Franchisee Associations.

30.     The DD Independent Franchise Owners Association ("DDIFO") is an independent association of Dunkin' franchisees located throughout the United States, including in the State of California.  DDIFO has been advocating for and protecting the interests of its members since 1989.  DDIFO is a founding member of the Washington, D.C. based Coalition of Franchisee Associations and proudly supports the Dunkin' brand and the franchise ownership business model in Washington, D.C. and in state legislatures throughout the United States.

31.     The IFA, AAHOA, SFA and the DDIFO have standing to pursue this action as associations because: (a) one or more of each of their members would have standing to sue in their own right; (b) the interests asserted in this litigation are germane to the their purposes as associations promoting and defending the franchise business model; and (c) neither the asserted claims nor the requested relief requires their members to participate individually.  *See Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977).

COMPLAINT

EAST:177538368.1

32.     Defendant State of California is a sovereign state.

33.     Defendant Xavier Becerra is the Attorney General of California and is charged with enforcing and defending all state laws, including the California Labor Code and California's wage orders.   California's wage orders are constitutionally authorized, quasi-legislative regulations that have the force of law.  *See* Cal. Const., art. XIV, § 1; Cal. Labor Code §§ 1173, 1178, 1178.5, 1182, 1185; *Industrial Welfare Comm'n v. Superior Court,* 27 Cal. 3d 690, 700-703 (1980).  Because this action challenges the constitutional validity of the wage orders and the Labor Code as authoritatively interpreted by the California Supreme Court (*see Auto Equity Sales, Inc. v. Superior Court of Santa Clara County,* 369 P.2d 937, 939 (1962) ("The decisions of this court are binding upon and must be followed by all the state courts of California")), the Attorney General is an appropriate party to defend this action. *See* Cal. Gov't Code § 12510 *et seq.*

34.     Defendant Julie Su is the Secretary of the California Labor and Workforce Development Agency.  The Labor and Workforce Agency is an executive branch agency overseeing the Department of Industrial Relations and its Divisions, including the Division of Labor Standards Enforcement and the Industrial Welfare Commission, the Employment Development Department, and the California Unemployment Insurance Appeals Board.  *See* Cal. Gov't Code § 12813.

35.     Defendant Katie Hagen is the Director of the Department of Industrial Relations, an executive agency in California that is charged with defending, amending, and republishing California's Wage Orders.[1]  *See* Cal. Labor Code § 1182.

---

[1]     The Industrial Welfare Commission, a five-member commission within the Department of Industrial Relations (Cal. Labor Code § 70), is charged by statute with promulgating wage orders for various industries.  Cal. Labor Code § 517.  Although the IWC was defunded by the Legislature effective July 1, 2004, its wage orders remain in effect.  *Bearden v. U.S. Borax, Inc.,* 138 Cal. App. 4th 429, 434 (2006).

COMPLAINT

EAST\177538368.1

36.     Defendant Lilia Garcia-Brower is the Labor Commissioner of the California Department of Industrial Relations, which is a department of the California Labor and Workforce Development Agency.  The Office of the Labor Commissioner (also known as the State "Division of Labor Standards Enforcement," or "DLSE") is specifically empowered by the Legislature to interpret and enforce the Industrial Welfare Commission ("IWC") Wage Orders.  *See* Cal. Labor Code §§ 61 and 1193.5. The DLSE investigates complaints and takes enforcement actions against companies, seeking to impose penalties on the basis that the company has misclassified employees as independent contractors.  Enforcement actions taken by the DLSE include audits of payroll records, collection of unpaid wages, and issuing citations for violations of any applicable wage order and Labor Code provisions.  The DLSE also adjudicates wage claims, pursuant to California Labor Code §§ 96 and 98, on behalf of franchisees who file claims contending that they are employees misclassified as independent contractors.

37.     Defendant Patrick Henning is the Director of the Employment Development Department. The Employment Development Department is specifically empowered by the Legislature to interpret and enforce the Unemployment Insurance Code.  *See* Unemployment Ins. Code § 317.

38.     Defendants Becerra, Su, Hagen, Garcia-Bower, and Henning are sued in their official capacities as representatives of California and as the officials responsible for enforcing California's ABC Test.

### The Nature Of Franchising

39.     Until the Lanham Act was passed in 1946, licensing a trademark was deemed a deceptive trade practice.   Once the Act was passed, a trademark could only be licensed as long as the licensor "sufficiently policed and inspected its licensees' operations to guarantee the quality of the products they sold under its trademarks to

COMPLAINT

EAST\177538368.1

the public." *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir. 1959).

40.     The establishment of the right to license a trademark created the modern franchise business model and has fueled the explosive growth of franchising over the last seven decades.   That business model and the "contractual arrangement [that underlies all franchised businesses] benefits both parties." *Patterson*, 60 Cal. 4th at 477.

41.     On the franchisor's side, franchising allows franchisors to monetize their brands and intellectual property in a way that both (i) preserves the powerful performance incentives associated with individual ownership at the retail level, and (ii) minimizes the investment in organizational structure and capabilities (including human capital and financial capital) needed to create a fully integrated retail business. In this way, franchising allows franchisors to focus on the development of the know-how they license to their franchisees, who pay royalties and fees for the right to use this know-how and "the right to sell products or services under the franchisor's name and trademark." *Patterson*, 60 Cal. 4th at 489.

42.     On the franchisee's side, franchisees receive among other things the advantages of brand equity of the franchisor's brand which draws customers to their retail businesses.  Brand equity may not only drive up the revenue a franchisee might expect as compared to a similar, independent business, but may also impact the value of a franchised business, which inures to a franchisee's benefit during the business's operations and when that franchisee elects to sell the franchised business. Accordingly, part of the value a franchisee receives when the franchisee enters into a franchise agreement is the franchisor's motivation and commitment to expend money and effort maintaining and enhancing the brand's value in addition to other benefits including the provision of training, marketing assistance as well system controls and oversight.

43.     Franchisors build brand equity by, among other things, enforcing quality standards.  The failure to enforce standards can impact each franchisee and the value of a franchisor's trademark.  Consumer dissatisfaction at a single franchised location may be wrongfully attributed to the entire system, thereby damaging the value of a franchisee's business, the goodwill associated with the franchisor's brand, and the health of a franchise system as a whole.

44.     In addition, franchisors offer their franchisees access to a tested operational system.  As the California Supreme Court has observed, in addition to a license to use the franchisor's trademark, a franchisee "also acquires a business plan, which the franchisor has crafted for all of its stores.  This business plan requires the franchisee to follow a system of standards and procedures.  A long list of marketing, production, operational, and administrative areas is typically involved.  The franchisor's system can take the form of printed manuals, training programs, advertising services, and managerial support, among other things." *Patterson*, 60 Cal. 4th at 489-90 (emphasis omitted).

45.     Access to a franchisor's system creates significant operational efficiencies which are intended to reduce franchisee financial risks because, instead of having to create an entirely new business from the ground up, a franchisee has access to an established brand and business system and can trade on the consumer goodwill that the brand has generated as a result of the "control over the franchisees' method of operation" exercised by the franchisor.

46.     Notwithstanding the franchisor's establishment of a detailed operational system, the franchisee "retains autonomy as a manager and employer." *Patterson*, 60 Cal. 4th at 478.  "It is the franchisee who implements the operational standards on a day-to-day basis, hires and fires store employees, and regulates workplace behavior." *Id*.  In fact, franchisees retain complete control over the employees they choose to hire in their franchises.

EAST\177538368.1

47.     Indeed, franchisees do not embark on ownership and operation of franchised businesses as an "employee" of the franchisor.  Quite the contrary, franchisees obtain an independent business for their own benefit and for the benefit of the brand which receives support from franchisors that is not available in ostensibly comparable independent business ventures, subject to the aforesaid controls and applicable contract provisions.

**Regulation of Franchising**

48.     Franchise arrangements are heavily regulated, both at the state and federal level.  Likewise, both state and federal law define what it means to be a "franchise."

49.     Under two separate statutes, control is an essential element of all franchised businesses.

50.     First, control is an element of the definition of "franchise" under federal law.  Under the FTC Franchise Rule, a franchise is defined as "any continuing commercial relationship or arrangement, whatever it may be called, in which the terms of the offer or contract specify, or the franchise seller promises or represents, orally or in writing, that:

(1)     The franchisee will obtain the right to operate a business that is identified or associated with the franchisor's trademark, or to offer, sell, or distribute goods, services, or commodities that are identified or associated with the franchisor's trademark;

(2)     *The franchisor will exert or has authority to exert a significant degree of control over the franchisee's method of operation, or provide significant assistance in the franchisee's method of operation*; and

(3)     As a condition of obtaining or commencing operation of the franchise, the franchisee makes a required payment or commits to make a required payment to the franchisor or its affiliate."

COMPLAINT

FTC Franchise Rule, 16 C.F.R. § 436.1(h) (emphasis added).

51.     The same concept is reflected in the state statute which regulates the sale of franchises in this State.  The CFIL defines a "franchise" as a contract or agreement, either expressed or implied, whether oral or written, between two or more persons by which:

(1)     A franchisee is granted the right to engage in the business of offering, selling or distributing goods or services *under a marketing plan or system prescribed in substantial part by a franchisor*; and,

(2)     The operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate;  and

(3)     The franchisee is required to pay, directly or indirectly, a franchise fee.

Cal. Corp. Code § 31005(a) (emphasis added).

52.     In fact, according to a release issued by the California Department of Financial Protection and Innovation, the agency responsible for regulating franchises, (Commissioner's Release 3-F, available at https://dfpi.ca.gov/commissioners-release-3-f/), "[i]f no marketing plan or system is prescribed and the franchisee is left entirely free to operate the business according to the franchisee's own marketing plan or system, the agreement is not a franchise."

53.     Second, for a business relationship to constitute a "franchise" under the FTC Franchise Rule, the franchisee must obtain the right to use the franchisor's trademark or service mark.  The Lanham Act, in turn, obligates a licensor to exercise control over the use of its trademark(s).  "The Lanham Act allows the use of a trademark by someone other than the owner *only* when the owner exercises sufficient control over the nature and quality of the goods or services sold under the trademark

EAST\177538368.1

of the other." William Finkelstein & James Sims, *The Intellectual Property Handbook* 39 (2005). "Where a licensor fails to exercise adequate quality control over a licensee, a court may find that the trademark owner has abandoned the trademark, in which case the owner would be estopped from asserting rights to the trademark." *Barcamerica Int'l v. Tyfield Importers, Inc.*, 289 F.3d 589, 595 (9th Cir. 2002) (internal quotations omitted). The California Supreme Court and the Ninth Circuit Court of Appeals, in fact, have both recognized that a franchisor *must* have the freedom to "impose[] comprehensive and meticulous standards for marketing its trademarked brand and operating its franchises in a uniform way." *Patterson*, 60 Cal. 4th at 478; *accord Salazar v. McDonald's Corp.*, 939 F.3d 1051 (9th Cir. 2019).

54.     The control over the methods, systems, and processes of the business that licensors are required to exercise over the use of their trademarks benefits not just franchisors, but consumers, who rightly assume that goods and services provided under the same mark should carry the same level of quality. Such control also benefits franchisees, who profit from the reputation and goodwill attached to the marks they have been licensed to use.

**California's ABC Test**

55.     In April of 2018, the California Supreme Court issued its opinion in *Dynamex Operations W. v. Superior Court*, 4 Cal. 5th 903 (2018). *Dynamex* adopted a new test – the "ABC Test" – for determining whether a worker is an employee or independent contractor for purposes of the Wage Orders of the Industrial Welfare Commission, 8 Cal. Code Regs. § 11000, *et seq.*

56.     Under the ABC Test, a worker is properly considered an independent contractor to whom a Wage Order does not apply only if the hiring entity establishes each of the following three criteria:

COMPLAINT

(A)    that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of such work and in fact;

(B)    that the worker performs work that is outside the usual course of the hiring entity's business; and

(C)    that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity.

*Dynamex*, 4 Cal. 5th at 916-917.

57.    On September 11, 2019, the California Legislature passed AB-5, which, among other things, was intended to "codify the decision of the California Supreme Court in *Dynamex* and ... clarify the decision's application in state law."  Cal. Labor Code § 2750.3.  The law, which was signed by the Governor on or about September 18, 2019, makes the ABC Test applicable to the provisions of the Labor Code, the Unemployment Insurance Code, and the Wage Orders of the Industrial Welfare Commission.

58.    Under AB-5: "[A] person providing labor or services for remuneration shall be considered an employee rather than an independent contractor unless the hiring entity demonstrates that all of the following conditions are satisfied:

(A)    The person is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact;

(B)    The person performs work that is outside the usual course of the hiring entity's business; and

(C)    The person is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

EAST\177538368.1

59.     AB-5 took effect on January 1, 2020.

60.     On September 4, 2020, the Governor signed AB-2257, which revised and recast the provisions of AB-5 and created certain exemptions.  Under AB-2257, the ABC Test applies to provisions of the Labor Code, the Unemployment Insurance Code, and the Wage Orders of the Industrial Welfare Commission.  AB-2257 took immediate effect on September 4, 2020.

## The Purposes of AB-5 Are Not Served by Applying it to Franchises

61.     AB-5's stated intent is to address the "harm to misclassified workers who lose significant workplace protections, the unfairness to employers who must compete with companies that misclassify, and the loss to the state of needed revenue from companies that use misclassification to avoid obligations such as payment of payroll taxes, payment of premiums for workers' compensation, Social Security, unemployment, and disability insurance."  AB-5, § 1(b).

62.     The California Legislature enacted the ABC Test in order "to ensure workers who are currently exploited by being misclassified as independent contractors instead of recognized as employees have the basic rights and protections they deserve under the law... By codifying the California Supreme Court's landmark, unanimous *Dynamex* decision, this act restores these important protections to potentially several million workers who have been denied these basic workplace rights that all employees are entitled to under the law."  AB-F 1(e).

63.     The franchise relationship is properly outside the ambit of California's ABC Test, which was implemented to ensure that workers who should properly be classified as employees have access to, among other things, workers compensation and unemployment benefits.  These kinds of employee benefits are not appropriate for franchisees who, by definition, are owners granted the "right to operate a business" (16 CFR 336.1(h)(1)).  Instead, as independent business owners, franchisees keep their businesses' profits, can sell their businesses, can access tax benefits like

business-related deductions, and are eligible for programs for business owners, like the Paycheck Protection Program, that employees cannot access.

64.     The franchise model offers franchisees independence as business owners to operate their own businesses, while also receiving the benefits of being part of a system. While system standards may be uniform across locations, how one franchisee or another chooses to manage his or her business can vary greatly.  Notably, franchise agreements that govern the relationship between franchisor and franchisee typically specify that franchisees are responsible for their own employment decisions and give franchisees the day-to-day control necessary to operate their individual businesses, subject to limited controls designed to protect the brand and consumer goodwill. Unlike employees, franchisees also build equity in their businesses and benefit from that equity when franchisees sell their businesses.

65.     In addition, franchisees are already required to pay appropriate payroll and withholding taxes on behalf of their employees, furnish them with appropriate workers' compensation insurance, and otherwise comply with wage and other employee protections in accordance with state law and federal law.  As a result, AB-5's stated intent is inapplicable in the franchise context, where workers are already considered employees of their respective franchised business and receive the attendant employment protections and benefits under California law.

**When Applied to Franchises, California's ABC Test is Preempted by the FTC Franchise Rule**

66.     The FTC Franchise Rule authorizes and regulates the sale of franchises.

67.     Under the FTC Franchise Rule, franchise relationships and employment relationships are mutually exclusive – *i.e.* a franchise is not an employment relationship and an employment relationship is not a franchise.  The FTC Franchise Rule Compliance Guide states that employment relationships "are excluded from coverage."  *See*  https://www.ftc.gov/system/files/documents/plain-language/bus70-

EAST\177538368.1

franchise-rule-compliance-guide.pdf.  As long ago as 1978, in the Statement of Basis and Purpose Relating to Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures, the FTC drew a distinction between employees and franchisees: "The popularity of franchising is, to a large extent, the result of the nature of franchising, a bringing together of persons who desire to be their own bosses with those who have an accepted product or a proven operating procedure and who have a need for expansion of capital and new management talent. Thus, franchising allows a firm to expand more rapidly than could be expected through internal growth, since it is designed to allow individuals to have more autonomy than mere employees while working at the same time with a profit incentive."

68.    If interpreted strictly, the "A" Prong of California's ABC Test could convert all franchises, as defined by the FTC Franchise Rule, into employment relationships, remove franchises from the purview of the FTC Franchise Rule and, therefore, stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, including the authorization and regulation of the sale of franchises.

69.    Under Prong A of the ABC Test, a franchisee is deemed an employee rather than an independent contractor unless the franchisee is *free* from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact.  However, under the FTC Franchise Rule and the plain language of the Lanham Act, a franchisee cannot be free from the control and direction of the franchisor.  Therefore, when interpreted strictly, Prong A classifies every franchisee as an "employee" of the franchisor.

70.    Similarly, under Prong B of the ABC Test, a person may not be classified as an independent contractor unless that person "performs work that is outside the usual course of the hiring entity's business."  Cal. Labor Code § 2775(b)(1)(B).  By

COMPLAINT

EAST\177538368.1

definition, all franchisees are granted the right to operate a business that is identified or associated with the franchisor's trademark.   16 C.F.R. 436.1(h).   If operating a business identified or associated with the franchisor's trademark (or offering, selling, or distributing goods, services, or commodities that are identified or associated with the franchisor's trademark) is considered performing work that is within the usual course of the franchisor's business, then Prong B of the ABC Test would convert all franchise relationships into employment relationships.

71.     By converting all franchises into employment relationships if interpreted strictly, California's ABC Test removes all franchises from the purview of the FTC Franchise Rule.   It therefore stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, including the authorization and regulation of the sale of franchises.

## When Applied to Franchises, California's ABC Test is Preempted by the Lanham Act

72.     One purpose and objective of the Lanham Act is to protect a trademark owner's investment in the trademark.  The Act specifically provides that "[t]he intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations." 15 U.S.C. § 1127.

73.     A critical piece of the trademark's value to the trademark owner is the well-established right to license the trademark, so long as the trademark owner

EAST\177538368.1

maintains control over the quality of the goods and services sold under the trademark by the licensee.  Franchising is one such form of licensing.

74.     The Lanham Act expressly "protect[s] registered marks used in such commerce from interference by State or territorial legislation."  15 U.S.C. § 1127.

75.     California's ABC Test is preempted with respect to franchisors and franchisees because it "stand[s] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (*Hillman v. Maretta*, 569 U.S. 483, 490 (2013)) including, without limitation, the protection of a trademark owner's investment in its trademark, its right to license the use of that mark, and its right and obligation to control the use of the mark.

76.     Franchising is fundamentally incompatible with the obligations that would be triggered if franchisees were deemed employees of franchisors under California's ABC Test.  For example, all franchise systems contemplate the franchisee will retain the profits and bear the losses of its own business.  However, the California Labor Code requires employers to indemnify their employees for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, meaning the franchisor (at least arguably) would need to bear the franchisee's losses.  Most franchise systems require franchisees to pay the franchisor an initial franchise fee and/or ongoing royalty fees in return for the rights and support that the franchisor provides to the franchisee.  However, the California Labor Code prohibits an employer from compelling any employee to patronize his employer in the purchase of anything of value, meaning the franchisor (at least arguably) could not charge the franchisee such fees.  Franchising is not viable if the franchisor must bear all the franchisee's losses and expenses and cannot charge any fees to the franchisee, as AB-5 would (at least arguably) require if interpreted strictly.

EAST\177538368.1

## FIRST CLAIM FOR RELIEF

### Declaratory Relief (28 U.S.C. section 2201)

77.     Plaintiffs incorporate by reference Paragraphs 1 through 76 of their Complaint, inclusive, as and for this Paragraph 77, as if fully set forth herein.

78.     Under the Supremacy Clause of the U.S. Constitution, Plaintiffs' members may not to be subjected to or punished under state laws that are preempted by federal law.

79.     An actual controversy exists among the parties because Plaintiffs assert that the application of California's ABC Test to franchisors and franchisees is preempted by federal law, specifically the FTC Franchise Rule and the Lanham Act, while Defendants assert it is not.

80.     Plaintiffs seek a declaration that the application of California's ABC Test to franchisors and franchisees, as defined by the FTC Franchise Rule, is preempted by federal law, specifically the FTC Franchise Rule and the Lanham Act.

### SECOND CLAIM FOR RELIEF

### (Injunctive Relief)

81.     Plaintiffs incorporate by reference Paragraphs 1 through 80 of their Complaint, inclusive, as and for this Paragraph 81, as if fully set forth herein.

82.     Defendants should be preliminarily and permanently enjoined from enforcing against franchisors and franchisees California's ABC Test.

83.     Enforcement against franchisors and franchisees of California's ABC Test severely and irreparably harms Plaintiffs' members.  Absent an injunction, Plaintiffs' members will suffer severe and irreparable harm, which includes, without limitation, the risk of civil liability, criminal liability, and determinations which threaten the viability and goodwill of their businesses and their constitutional rights.

84.     As a result, the Plaintiffs and their members have no adequate remedy at law.

85.     Plaintiffs' members' injuries are preventable and redressable with appropriate injunctive relief that prevents Defendants from enforcing the ABC Test against franchisors and franchisees.

86.     The balance of harms weighs in favor of the entry of injunctive relief. Defendants cannot claim an interest in the enforcement of an unconstitutional law.

87.     The public interest also favors the entry of injunctive relief because the public is interested in the enforcement of constitutional rights and because franchising, and the continued viability of the franchise business model, is beneficial to the public and the California economy.

## **Prayer for Relief**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.      A declaration that, with respect to franchisors and franchisees, as those terms are defined by the FTC's Franchise Rule, California's ABC Test is preempted by federal law;

B.      A preliminary and permanent injunction prohibiting Defendants, and any division, board, or commission within such Defendants, from enforcing California's ABC Test with respect to franchisors and franchisees; and

C.      Such other relief as this Court deems just and proper.

COMPLAINT

EAST\177538368.1

DATED:  November 17, 2020

Respectfully submitted,

**/s/ Karen C. Marchiano**

DLA PIPER LLP (US)
By: Karen C. Marchiano
Norman Leon

BRYAN CAVE LEIGHTON PAISNER LLP
Jonathan Solish

Attorneys for Plaintiff International Franchise Association

**/s/ Grant A. Nigolian**

GRANT NIGOLIAN, P.C.
By: Grant A. Nigolian

MARKS & KLEIN LLP
Justin M. Klein
Andrew P. Bleiman

Attorneys for Plaintiffs International Franchise Association, Asian American Hotel Owners Association, The Supercuts Franchisee Association, and the DD Independent Franchise Owners Association

COMPLAINT

EAST\177538368.1