DLA PIPER LLP (US)
Norman Leon (pro hac vice forthcoming)
norman.leon@dlapiper.com
444 West Lake Street, Suite 900
Chicago, IL 60606-0089
T. 312.368.4000

DLA PIPER LLP (US)
Karen C. Marchiano (SBN 233493)
karen.marchiano@dlapiper.com
2000 University Ave.
East Palo Alto, CA 94303-2214
T. 650.833.2000

BRYAN CAVE LEIGHTON PAISNER
Jonathan C. Solish (CA SBN 67609)
Jean-Claude André (CA SBN 213538)
jonathan.solish@bclplaw.com
jcandre@bclplaw.com
120 Broadway, Suite 300
Santa Monica, CA 90401-2386 USA
T: 310.576.2100

Attorneys for Plaintiff
INTERNATIONAL FRANCHISE ASSOCIATION

GRANT NIGOLIAN, P.C.
Grant A. Nigolian (CA SBN 184101)
grant@gnpclaw.com
695 Town Center Drive, Suite 700
Costa Mesa, CA 92626
Tel: 310.853.2777

MARKS & KLEIN LLP
Justin M. Klein (pro hac vice forthcoming)
justin@marksklein.com
Andrew Bleiman (pro hac vice forthcoming)
andrew@marksklein.com
63 Riverside Avenue
Red Bank, NJ 07701
Tel: 732.747.7100

Attorneys for Plaintiffs
INTERNATIONAL FRANCHISE ASSOCIATION,
ASIAN AMERICAN HOTEL OWNERS
ASSOCIATION, THE SUPERCUTS
FRANCHISEE ASSOCIATION, and the
DD INDEPENDENT
FRANCHISE OWNERS ASSOCIATION

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERNATIONAL FRANCHISE ASSOCIATION, ASIAN AMERICAN HOTEL OWNERS ASSOCIATION, SUPERCUTS FRANCHISEE ASSOCIATION, and the DD INDEPENDENT FRANCHISE OWNERS ASSOCIATION, <br><br> Plaintiffs, | CASE NO. 3:20-CV-02243-BAS-DEB <br><br> **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

v.

STATE OF CALIFORNIA; MATTHEW RODRIQUEZ, IN HIS OFFICIAL CAPACITY AS ACTING ATTORNEY GENERAL FOR THE STATE OF CALIFORNIA; JULIE SU, IN HER OFFICIAL CAPACITY AS LABOR COMMISSIONER OVER THE DIVISION OF LABOR STANDARDS ENFORCEMENT; LILIA GARCIA-BOWER, LABOR COMMISSIONER OF THE CALIFORNIA DEPARTMENT OF INDUSTRIAL RELATIONS; KATIE HAGEN, DIRECTOR OF THE DEPARTMENT OF INDUSTRIAL RELATIONS; and PATRICK HENNING, DIRECTOR OF THE EMPLOYMENT DEVELOPMENT DIVISION,

Defendants.

Plaintiffs, the International Franchise Association (the "IFA"), the Asian American Hotel Owners Association ("AAHOA"), the Supercuts Franchisee Association ("SFA") and the DD Independent Franchise Owners Association ("DDIFO"), as and for their First Amended Complaint against Defendants, allege as follows:

## **INTRODUCTION**

1.      The IFA, AAHOA, SFA and DDIFO (collectively, "Plaintiffs") bring this lawsuit to enforce their federal rights as provided by federal statute and guaranteed by the Supremacy Clause, Commerce Clause, Fifth Amendment, and Fourteenth Amendment of the United States Constitution.  This lawsuit addresses California's new test for determining whether a worker is an employee or independent contractor, as interpreted by the California Supreme Court in *Dynamex Operations West, Inc. v.*

2

1  *Superior Court*, 4 Cal. 5th 903 (2018) ("*Dynamex*") and subsequently codified by the

2  California Legislature through Assembly Bill 5 ("AB-5") and Assembly Bill 2257

3  ("AB-2257") as Cal. Labor Code § 2775(b)(1) ("California's ABC Test").   The

4  Plaintiffs seek declaratory and injunctive relief prohibiting Defendants from applying

5  California's ABC Test to disrupt the relationship between franchisors and franchisees

6  (as those terms are defined under 16 C.F.R. § 436.1(i) and (k)).

7       2.     Franchising has "existed in this country in one form or another for over

8  150 years" (*Patterson v. Domino's Pizza, LLC*, 60 Cal. 4th 474, 489 (2014)), and,

9  more recently, has "become a ubiquitous" and "thriving business model." *Id*. at 477.

10  Under this business model, the franchisor, "sells the right to use its trademark and

11  comprehensive business plan" to franchisees who "independently own[], run[], and

12  staff[] the retail outlet that sells goods under the franchisor's name." *Id.*

13      3.     Franchised businesses currently operate in more than a hundred different

14  business sectors.   In addition to industries in which franchising has long been

15  prevalent, such as automotive repairs and services, hotels and motels, quick-service

16  and full-service restaurants, tax preparation businesses and real estate brokerages,

17  franchised industries also include, among many others, home health care and senior

18  care, home repair and remodeling, package shipping, hair care, fitness, financial

19  services, childcare, tutoring, and swim schools.

20      4.     The entities that choose to operate franchised businesses are as varied as

21  the types of businesses that have chosen to franchise their business models.   While a

22  large segment of franchisees are individual entrepreneurs seeking to own and operate

23  their first business, many franchisees have grown into immense operations with tens

24  of thousands of employees and hundreds of locations.   Many operate multiple brands.

25  Still other franchisees are public companies.   In light of its enormous growth,

26  franchising has a profound effect on the economy, both nationally and in the State of

27  California.   In 2019, in California alone, there were more than 82,600 independently

28

3

EAST\180232303.2

owned and operated franchised businesses. These franchised businesses collectively generated more than $82.9 billion in economic output.

5.      Further, franchisees are significant job creators in their communities.  In 2019, franchisees in this State employed almost 827,000 people, and collectively generated $35.3 billion in payroll.

6.      Franchisors and franchisees share the common goals of success and survival.  Matters which restrict or undermine franchisors will invariably have an equal or greater detrimental effect on franchisees (who rely heavily on the franchisor's brand and systems for operation) and the nearly 827,000 people employed by franchised businesses in this State.

7.      Franchising offers a wide array of individuals the opportunity to develop, own, and operate their own businesses and, as such, franchising represents for many Americans a piece of the American Dream.  This is especially true for those whose education level or other characteristics could pose barriers in other industries.

8.      The franchise business model is based upon a franchisor granting a franchisee the right to operate a business following a "system prescribed in substantial part by the franchisor," which "must be substantially associated with" a "commercial symbol designating the franchisor," in exchange for a franchise fee.   *When Does an Agreement Constitute a Franchise?"* California Department of Corporations, Release 3-F (June 22, 1996) ("Release 3-F"), *reprinted at* Bus. Franchise Guide (CCH) ¶ 5050.45 (June 22, 1996).

9.      While such arrangements are ubiquitous today, their development was impeded by legal restrictions for many years.  Historically, trademarked goods were viewed as identifying the source of products, so that consumers would know which company had actually placed them into commerce.  Licensing a company other than the trademark owner to distribute trademarked products was considered a deceptive practice, because consumers would be misled as to the source of the products.

FIRST AMENDED COMPLAINT

EAST\180232303.2

10.     In *Macmahan Pharmacal Co. v. Denver Chem. Mfg. Co.*, 113 F. 468, 474-75 (8th Cir. 1901), for example, the plaintiff had licensed others to use its "antiphlogistine" trademark, but the Eighth Circuit held that a "trade-mark cannot be assigned or its use licensed. . . ."  Because the licensor had deceived the public about the source of its product by allowing a licensee to distribute products bearing its antiphlogistine trademark, any legal right to injunctive relief had been forfeited.

11.     Following the same logic, the licensor of the "National" sewing machine brand could not collect agreed-upon royalties because it had no legal right to license others to distribute products unless it had actually participated in their production. *Lea v. New Home Sewing Mach. Co.*, 139 F. 732 (C.C.E.D.N.Y. 1905).  *See also Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 366 (2d Cir. 1959) ("Prior to the passage of the Lanham Act many courts took the position that the licensing of a trademark separately from the business in connection with which it had been used worked an abandonment.").

12.     The Trademark Act of 1905 was consistent with the common law and did not grant trademark owners the right to assign the use of their trademarks to others.[1]  Just after World War II, Congress passed the Trademark Act of 1946, known as the Lanham Act.[2]  Although the term "licensing" was not used in the Lanham Act, a trademark owner was given the right to license a trademark to a "related company."[3]  A "related company" was one "who legitimately controls *or is controlled by the*

---

[1] *See* Rogers, *The Lanham Act & the Social Function of Trademarks*, 14 Law & Contemp. Probs. 173, 180 (1949); *Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103 (2d Cir. 1988).

[2] 15 U.S.C. § 1051 *et seq.*

[3] Lanham Act, 15 U.S.C. §§ 1051-1127.  Further terms were added to the statute in 1988.

FIRST AMENDED COMPLAINT

EAST\180232303.2

*registrant* or applicant for registration in respect to the nature and quality of the goods or services in connection with which the mark is used."[4]

13.     Addressing concerns that the public might be deceived as to the source of trademarked products, "the Lanham Act places an affirmative duty upon a licensor of a registered trademark to take reasonable measures to detect and prevent misleading uses of his mark by his licensees or suffer cancellation of his federal registration." *Dawn Donut*, 267 F.2d at 366.[5]

14.     After the passage of the Lanham Act, an infringing user of the "Dawn" brand on bakery goods counter-claimed to cancel the trademark owner's registration of the Dawn mark, claiming the mark had been abandoned when others had been licensed to use it.  The counter-claim would have been viable under prior law.  The Second Circuit upheld the trademark owner's legal right to license the use of the mark under the Lanham Act, as long as "the plaintiff sufficiently policed and inspected its licensees' operations to guarantee the quality of the products they sold under its trademarks to the public." *Id.* at 367.  The Second Circuit upheld the right to license a trademark, but ultimately disagreed as to whether the specific quality control inspections conducted by the trademark owner had been sufficiently rigorous. *Id.* at 366-67.

15.     Under the Lanham Act, a trademark owner may license the use of its mark but *must* exercise control over its licensees' use of the mark.  A "registrant's mark may be canceled if the registrant fails to control its licensees' use of the licensed mark."  *In re Mini Maid Services Co. v. Maid Brigade Systems, Inc.*, 967 F.2d 1516, 1519 (11th Cir. 1992).  Where a licensor fails to "exercise adequate quality control

---

[4] 15 U.S.C. § 1127 (emphasis added).

[5] *See also* 3 *McCarthy on Trademarks and Unfair Competition* § 18:38 (5th ed.).

EAST\180232303.2

over the licensee," "a court may find that the trademark owner has abandoned the trademark." *FreecycleSunnyvale v. Freecycle Network,* 626 F.3d 509, 516 (9th Cir. 2010). Quality control must be sufficient to ensure that "all licensed outlets will be consistent and predictable." *Barcamerica, Int'l USA Trust v. Tyfield Importers, Inc*., 289 F.3d 589, 598 (9th Cir. 2002).

16.    In 1950, just after the adoption of the Lanham Act, there were still fewer than 100 franchised systems in the United States, but—as the FTC has noted—franchising experienced "explosive growth" thereafter.[6]  By 1965, there were 1,200 franchise systems with 350,000 outlets.[7]  In 2010, the United States Census Bureau released its first-ever comprehensive report for franchised business. *Patterson v. Domino's Pizza*, LLC, 60 Cal. 4th 474, 489, fn. 13 (2014).  Franchises accounted for 10.5 percent of businesses with paid employees in the 295 industries in which data was collected.  *Id.* Franchised businesses also accounted for almost $1.3 trillion out of the $7.7 trillion in total sales for these industries, $153.7 billion out of the $1.6 trillion in total payroll, and 7.9 million workers out of a total workforce of 59 million. *Id.*

17.    Franchising is also a statutorily recognized and permissible method of doing business.  Without exception, all of the statutes that regulate franchising recognize that the relationship between a franchisor and its franchisees is a commercial relationship, not an employment relationship.  Importantly, the Federal Trade Commission ("FTC"), which authorizes and regulates the sale of franchises in the United States, defines a "franchise" in part as "any continuing *commercial* relationship or arrangement" whereby the franchisor promises that the franchisee "will obtain the right *to operate a business* that is identified or associated with the

---

[6] FTC Statement of Basis and Purpose, Bus. Franchise Guide (CCH) ¶ 6302.

[7] *Id.*

FIRST AMENDED COMPLAINT

franchisor's trademark ...." 16 C.F.R. § 436.1(h)(1).   (16 C.F.R. § 436 *et seq*. is hereinafter the "Franchise Rule").

18.     While the FTC Franchise Rule does not govern the relationship between a franchisor and a franchisee once a franchise agreement has been executed, it specifically defines which relationships constitute "franchises" under federal law. The FTC Franchise Rule defines a "franchise" as "any continuing commercial relationship or arrangement, whatever it may be called, in which the terms of the offer or contract specify, or the franchise seller promises or represents, orally or in writing, that ... [t]he franchisor *will exert or has authority to exert a significant degree of control* over the franchisee's method of operation, or provide significant assistance in the franchisee's method of operation." 16 C.F.R. § 436.1(h)(2) (emphasis added).

19.     Likewise, the FTC Franchise Rule requires that a franchisee receive from the franchisor "the right to operate a business that is identified or associated with the franchisor's trademark, or to offer, sell, or distribute goods, services, or commodities that are identified or associated with the franchisor's trademark."  16 C.F.R. § 436.1.

20.     These controls, however, are not just intended to protect a franchisor's system or the value of its trademarks.  Because "uniformity of product and control of its quality cause the public to turn to [the] franchise[d] [business]" (*Burger King Corp. v. Stephens*, 1989 WL 147557, at *12 (E.D. Pa. Dec. 6, 1989)), the value of the brand a franchisee chooses to affiliate with is directly impacted by a franchisor's ability to maintain consistency and quality.  "By following the standards used by all stores in the same chain, the self-motivated franchisee profits from the expertise, goodwill, and reputation of the franchisor." *Patterson*, 60 Cal. 4th at 477.  A satisfactory experience in one franchised location may encourage a consumer to visit that location again, or, critically, other locations in the system that offer the same satisfactory experience. Conversely, consumer dissatisfaction with an experience at a single franchised location can be attributed to the franchise system as a whole.  Therefore, the standards

FIRST AMENDED COMPLAINT

EAST\180232303.2

a franchisor is required to establish greatly impact and help protect a franchisee's investment and the equity it has built in its business.

21.   Franchisors, franchisees, and franchisees' employees who work in franchised businesses all derive their own independent benefits from this unique, controlled, and codified "business relationship."  *See, e.g.*, Cal. Corp. Code §§ 31001, 31005(a)(2) & 31011.

22.   A franchisor's controls over system standards help protect the interests of consumers.  By establishing and enforcing standards for operational matters like cleanliness, food storage and preparation, and safety, franchisors not only protect the expectations of consumers who choose to patronize franchised businesses, but help ensure that guidelines are put in place to protect their health and safety.

23.   The FTC Franchise Rule is logically consistent in treating franchise relationships and employment relationships as mutually exclusive – *i.e.,* a franchise is not an employment relationship.

24.   The California Legislature has enacted two statutes to regulate franchise relationships in this State (the California Franchise Investment Law, Cal. Corp Code § 31000 *et seq.* [the "CFIL"] and the California Franchise Relations Act, Cal. Bus. & Prof. Code § 20000 *et seq.* [the "CFRA"]).  These statutes have co-existed with the Lanham Act for almost 50 years because they contain similar definitions of the "franchise" relationship and, thus, are legally compatible.  Like the FTC's Franchise Rule, these enactments repeatedly characterize franchises as "businesses" and describe the relationship created between a franchisor and a franchisee as a "business relationship."  *See, e.g.*, Cal. Corp. Code § 31001 (disclosures are designed to give a better understanding of the parties' "business relationship"); § 31005(a)(2) ("[t]he operation of the franchisee's business" must be substantially associated with the franchisor's trademark); § 31011 (franchise fee is the amount paid "for the right to enter into a business under a franchise agreement").

FIRST AMENDED COMPLAINT

EAST\180232303.2

25.     California's ABC Test, however, is irreconcilable with the federal laws that regulate franchising and the trademark license underlying all franchised businesses.

26.     As both the California Supreme Court and the Ninth Circuit Court of Appeals have held, franchisors "need the freedom to 'impose[ ] comprehensive and meticulous standards for marketing [their] trademarked brand and operating [their] franchises in a uniform way.'"  *Salazar v. McDonald's Corp*., 944 F.3d 1024, 1030 (9th Cir. 2019) (quoting *Patterson*, 60 Cal. 4th at 478).  A franchisor's "involvement in its franchises and with workers at the franchises is central to modern franchising and to the company's ability to maintain brand standards …."  *Salazar*, 944 F.3d at 1030.

27.     The ABC Test impermissibly impinges on the essential feature of the franchise model—control over brand-specific systems and business models. Without control, franchisors would be forced to abandon their required support and system oversight, resulting in harm to both franchisees and consumers.

28.     In "the typical arrangement, the franchisee decides who will work as his employees, and controls day-to-day operations in his store."  *Patterson*, 60 Cal. 4th at 490.  There are "sound and legitimate reasons … to allocate local personnel issues almost exclusively to the franchisee."  *Id.* at 497.  Because franchisees are "owner-operators who hold a personal and financial stake in the business," a "major incentive is the franchisee's right to hire the people who work for him, and to oversee their performance every day."  *Id.*  One of the principal reasons people become franchisees is to become their own bosses.  Whether a franchisee wishes to engage in work at a franchised business is determined by the franchisee, not the franchisor.

29.     Prong A of the ABC Test is different from *Borello*.  In determining whether a relationship qualifies as an employment relationship, *Borello* requires the factfinder to weigh a number of factors; "the individual factors cannot be applied

FIRST AMENDED COMPLAINT

mechanically as separate tests; they are intertwined and their weight depends often on particular combinations.*  *S. G. Borello & Sons, Inc. v. Dep't of Indus. Rels*., 48 Cal. 3d 341, 351 (1989).  Under the *Borello* test*,* the fact that the parties have signed a commercial agreement that governs their relationship might be the determinative factor.  Cal. Labor Code § 2775(b)(1) turns a blind eye to whether the parties have agreed upon a commercial relationship that is inconsistent with an employment relationship.

30.   Under the ABC Test, the A factor alone may be determinative. Specifically, under Prong A of the ABC Test, a person may not be classified as an independent contractor unless that person is "*free* from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact."   Cal. Labor Code § 2775(b)(1)(A) (emphasis added).  Yet, under a franchise relationship, "[t]he franchisor *must maintain some control over the franchisee.*"  *Kelton v. Stravinski,* 138 Cal.App.4th 941, 948 (2006)*.*  If a franchisor "must maintain some control" and an independent contractor must be "free from control," then according to the ABC Test's express terms, franchise relationships are necessarily employment relationships.  In other words, *by its express terms*, Cal. Labor Code § 2775(b)(1), converts commercial franchise relationships into employment relationships, fundamentally disrupting a well-established and governmentally sanctioned form of commercial relationship that has been closely regulated by law for many years.

31.   Similarly, under Prong B of the ABC Test, a person may not be classified as an independent contractor unless that person "performs work that is outside the usual course of the hiring entity's business."  Cal. Labor Code 2775(b)(1)(B).  In the context of a franchise relationship, under California law, the operation of a franchisee's business *must* be "under a marketing plan or system prescribed in substantial part by the franchisor," and "substantially associated with the franchisor's

FIRST AMENDED COMPLAINT

EAST\180232303.2

trademark." Cal. Corp. Code § 31005.  (Similarly, under 16 CFR 436.1(h)(1-2) of the FTC Franchise Rule, the franchisee must "obtain the right to operate a business that is identified or associated with the franchisor's trademark, or to offer, sell, or distribute goods, services, or commodities that are identified or associated with the franchisor's trademark" and the franchisor must have authority to "exert a significant degree of control over the franchisee's method of operation.")  If the franchisor's trademark identifies the goods or services sold by the franchisee and the franchisee is operating under a plan prescribed by the franchisor, the work of the franchisee does not appear to be "outside the usual course" of the franchisor's business.

32.    Franchisees generally enter into commercial franchise relationships so that they can operate their own businesses.  The value of the brand is maintained by consistent adherence to brand standards by all businesses operated in association with the brand.  A prospective franchisee generally considers association with a brand that has achieved success in a particular sector.  For example, a franchisee interested in operating a restaurant that sells pizza would seek out a franchisor with a proven track record in that sector, rather than a franchisor associated with the sale of automobile mufflers.  In this sense, every franchisor is necessarily in the same business as its franchisees and in peril of failing the B Prong of the ABC Test.

33.    Recently, this dissonance between the ABC Test and the franchise business model was emphasized by the United States District Court for the District of Massachusetts.  In the case of *Patel v. 7-Eleven*, Inc., No.17-cv-11414-NMG, 2020 U.S. Dist. LEXIS 165057 (Sept. 10, 2020), the district court applied Massachusetts' version of the ABC Test to a franchise relationship.  California adopted the Massachusetts' ABC Test in *Dynamex*.  The *Patel* court identified the "inherent conflict" between the FTC Franchise Rule and Massachusetts' version of the ABC Test.  The court stated that: "It cannot be the case, as plaintiffs suggest, that, in qualifying as a franchisee pursuant to the FTC's definition, an individual necessarily

FIRST AMENDED COMPLAINT

becomes an employee.  In effect, such a ruling by this Court would eviscerate the franchise business model, rendering those who are regulated by the FTC Franchise Rule criminally liable for failing to classify their franchisees as employees." *Patel,* 2020 U.S. Dist. LEXIS 165057, at *24.  These comments are in accord with the statement of the California Supreme Court in *Patterson,* 60 Cal. 4th at 498, that a rule that imposed liability based upon brand controls would disrupt the commercial franchise business model.

34.     As noted above, Prong A of California's ABC Test requires that a person be "*free* from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact."  Cal. Labor Code § 2775(b)(1)(A) (emphasis added).  This cannot be reconciled with the FTC Franchise Rule, which defines a franchise as one in which "the franchisor *will exert or has authority to exert a significant degree of control* over the franchisee's method of operation …."  *Patel*, 2020 U.S. Dist. LEXIS 165057, at *19 citing 16 C.F.R. § 436.1 (emphasis added).  Further, franchise agreements are usually long-term agreements often for periods of ten or twenty years, where additional renewal rights and material modifications of franchise agreements are regulated under the CFIL and CFRA, so that the terms under the contract in Prong A are fixed and cannot be unilaterally changed to adapt to Cal. Labor Code § 2775(b)(1).

35.     The Lanham Act grants the owners of trademarks a right they did not have before its passage—the right to license registered trademarks.  One of the three fundamental elements of a franchise is the license of a trademark.  Franchisors and franchisees have relied upon their right to establish a commercial relationship centered around the licensing of a trademark.  The right to license a trademark is conditioned upon the exercise of brand controls.  Cal. Labor Code § 2775(b)(1) fundamentally disrupts the right to license trademarks, by invalidating commercial franchise relationships and replacing them with an arbitrary and unwarranted

FIRST AMENDED COMPLAINT

EAST\180232303.2

employment relationship that is unwelcome to franchisors and franchisees in legitimate franchise relationships.  The Lanham Act expressly "protect[s] registered marks used in such commerce from interference by State or territorial legislation."  15 U.S.C. § 1127.  The ABC Test thus stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, impeding the express statutory right to license a trademark and sanctioning the establishment and regulation of long-term commercial franchise relationships.

36.    For these and the additional reasons set forth below, Plaintiffs seek a declaration that California's ABC Test as applied to the relationship between franchisors and franchisees is preempted by the FTC Franchise Rule and the Lanham Act, imposes excessive burdens in violation of the Commerce Clause of the U.S. Constitution, and violates the Fifth and Fourteenth Amendments, and a corresponding injunction prohibiting Defendants from applying California's ABC Test to the relationship between franchisors and franchisees, as well as costs and attorneys' fees.

## JURISDICTION AND VENUE

37.    This Court has subject matter jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1343, in that this action arises under the Constitution and laws of the United States, including the Supremacy Clause (U.S. Const. Art. VI), the Commerce Clause (U.S. Const. Art. I), the Fifth and Fourteenth Amendments, the Lanham Act (15 U.S.C. § 1051, *et seq.*), the FTC Franchise Rule (16 CFR § 436.1, *et seq.*), and 42 U.S.C. § 1983.  This Court has equitable jurisdiction to enjoin unlawful state action that is preempted by federal law. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324-25 (2015).

38.    This Court also has subject matter jurisdiction over this matter under 28 U.S.C. § 2201 in that this is a proceeding for declaratory judgment and injunctive relief under 28 U.S.C. §§ 2201-2202, 42 U.S.C. § 1983, and the Supremacy Clause and Commerce Clause and the Fifth and Fourteenth Amendments of the United States

EAST\180232303.2

Constitution. This action presents an actual controversy within the Court's jurisdiction.

39.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b). Plaintiffs' members entered into franchise agreements that contemplate performance in this judicial district, such that a substantial part of the events giving rise to the claims occurred in this judicial district.

## PARTIES

40.    The IFA is the world's oldest and largest organization representing the franchising industry.  Since 1960, it has educated franchisors and franchisees on beneficial methods and business practices to improve the commercial franchising model.  It also advocates on behalf of franchisors and franchisees.  Through its educational, public-policy, and government-relations programs, it furthers the interests of the more than 733,000 franchise establishments which span over 300 different industries, support nearly 7.6 million jobs, and contribute more than $674 billion to the U.S. economy.  Its members operate in all 50 states, including California.

41.    There are more than 23,000 hotels in California, many of which are operated pursuant to long-term commercial franchise agreements.  Hotel owners have often made substantial investments in building or purchasing hotels and enter into franchise relationships to improve the performance of their businesses and not to obtain for hotel owners the coverage of minimum wage and other benefits accorded by law to "employees."

42.    AAHOA is the largest hotel owners' association in the nation.  AAHOA's more than 19,500 members own almost one in every two hotels in the United States. With billions of dollars in property assets and hundreds of thousands of employees, AAHOA's members are core economic contributors in virtually every community. AAHOA's mission is to advance and protect the business interests of hotel owners

FIRST AMENDED COMPLAINT

EAST\180232303.2

through advocacy, industry leadership, professional development, member benefits, and community engagement.

43.     Supercuts Franchisee Association ("SFA") represents over 1500 salons across the United States, including in the State of California. Founded in 1985, SFA is dedicated to enhancing the personal and professional lives of its members through education, leadership development, best practice sharing and advocacy in the franchising and salon industries.  The SFA is a founding member of the Washington, D.C.-based Coalition of Franchisee Associations.

44.     The Dunkin Donuts Independent Franchise Owners Association ("DDIFO") is an independent association of Dunkin' franchisees located throughout the United States, including in the State of California.  DDIFO has been advocating for and protecting the interests of its members since 1989.  DDIFO is a founding member of the Washington, D.C.-based Coalition of Franchisee Associations and proudly supports the Dunkin' brand and the franchise ownership business model in Washington, D.C. and in state legislatures throughout the United States.

45.     The IFA, AAHOA, SFA and the DDIFO have standing to pursue this action under both an associational/representational theory and an organizational theory.

46.     Plaintiffs have standing under the associational/representational theory because: (a) one or more of each of their members would have standing to sue in their own right; (b) the interests asserted in this litigation are germane to their purposes as associations promoting and defending the franchise business model; and (c) neither the asserted claims nor the requested relief requires their members to participate individually.  *See Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 373 (1977).  On information and belief, the State of California has taken the position that franchisors who fail the ABC Test cannot register to sell franchises in

FIRST AMENDED COMPLAINT

the State, and has threatened that it would bar one or more members of Plaintiffs from selling franchises in California.

47.     Virtually all franchise agreements state that the parties are independent contractors.  Under the express language of Cal. Labor Code § 2775(b)(1), all of IFA's members are currently subject to civil and criminal penalties for misclassification and willful misclassification.  The terms of franchise relationships must be accurately disclosed to prospective franchisees before a franchise contract may be signed under the FTC rule and the California Franchise Investment Law.  A franchisor does not have the unilateral right to modify the terms of a franchise agreement in California and does not have the legal right to "re-classify" a franchisee as an employee. Reclassifying a franchisee as an employee would repudiate and modify material terms of a franchise agreement in violation of California law.

48.     Generally, franchisees enter into franchise relationships so that they can run their own businesses.  Although the franchisor exercises control over the trademarks and the products and services provided with regard to such trademarks, the franchisee has general control over the business operation, and selecting, supervising, compensating, scheduling and hiring and firing of all employees.  This general control over employees of the franchised business includes determining the work done by the owner of the franchise business.  The franchisee also retains all of the profits from the operation of the branded business.  The right of AAHOA's, SFA's and DDIFO's members to control their own relationships with their own employees is also disrupted by the express language in Cal. Labor Code § 2775(b)(1).  Under Cal. Labor Code § 2860, which Section 2775(b)(1) would make applicable to franchisees under its express language, "everything which an employee acquires by virtue of his employment, except the compensation which is due to him from his employer, belongs to the employer…"  AAHOA's, SFA's and DDIFO's members are currently at risk of losing the benefits of ownership of a franchise, in light of Cal.

---

17

Labor Code § 2775(b)(1) and 2860, in favor of the far less advantageous benefits of an unwanted employment relationship.

49.  Cal. Labor Code § 2775(b)(1) has disrupted ongoing commercial franchise relationships in the state of California so that both franchisors and franchisees must operate with uncertainty as to their rights and obligations toward one another if the  employment relationship is forced upon them by operation of law.

50.  Plaintiffs also have standing under the organizational theory because: (a) the application of the ABC Test to their members frustrates their organizational missions; and (b) has resulted in the diversion of Plaintiffs' resources to combat the application of the ABC Test.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

51.  Plaintiffs' members are suffering actual injuries in fact, including, without limitation, an invasion of a legally protected interest that is concrete and particularized.   Among other injuries, California's ABC Test causes Plaintiffs' members to bear legal, administrative, and operating costs to address the impact of the ABC Test on their franchise systems and the interference with their contractual relations.

52.  Defendant State of California is a sovereign state.

53.  Defendant Matthew Rodriquez is the acting Attorney General of California and is charged with enforcing and defending all state laws, including the California Labor Code and California's wage orders.  California's wage orders are constitutionally authorized, quasi-legislative regulations that have the force of law. *See* Cal. Const., art. XIV, § 1; Cal. Labor Code §§ 1173, 1178, 1178.5, 1182, 1185; *Industrial Welfare Comm'n v. Superior Court,* 27 Cal. 3d 690, 700-703 (1980). Because this action challenges the constitutional validity of the wage orders and the Labor Code as authoritatively interpreted by the California Supreme Court (*see Auto Equity Sales, Inc. v. Superior Court of Santa Clara County,* 57 Cal. 2d 450, 454-5

FIRST AMENDED COMPLAINT

EAST\180232303.2

(1962) ("The decisions of this court are binding upon and must be followed by all the state courts of California"), the Attorney General is an appropriate party to defend this action. *See* Cal. Gov't Code § 12510 *et seq.*

54.     Defendant Julie Su is the Secretary of the California Labor and Workforce Development Agency.  The Labor and Workforce Agency is an executive branch agency overseeing the Department of Industrial Relations and its Divisions, including the Division of Labor Standards Enforcement and the Industrial Welfare Commission, the Employment Development Department, and the California Unemployment Insurance Appeals Board.  *See* Cal. Gov't Code § 12813.

55.     Defendant Katie Hagen is the Director of the Department of Industrial Relations, an executive agency in California that is charged with defending, amending, and republishing California's Wage Orders.[8]  *See* Cal. Labor Code § 1182.

56.     Defendant Lilia Garcia-Brower is the Labor Commissioner of the California Department of Industrial Relations, which is a department of the California Labor and Workforce Development Agency.  The Office of the Labor Commissioner (also known as the State "Division of Labor Standards Enforcement," or "DLSE") is specifically empowered by the Legislature to interpret and enforce the Industrial Welfare Commission ("IWC") Wage Orders.  *See* Cal. Labor Code §§ 61 and 1193.5. The DLSE investigates complaints and takes enforcement actions against companies, seeking to impose penalties on the basis that the company has misclassified employees as independent contractors.  Enforcement actions taken by the DLSE include audits of payroll records, collection of unpaid wages, and issuing citations for violations of any applicable wage order and Labor Code provisions.  The DLSE also

---

[8]     The Industrial Welfare Commission, a five-member commission within the Department of Industrial Relations (Cal. Labor Code § 70), is charged by statute with promulgating wage orders for various industries.  Cal. Labor Code § 517.  Although the IWC was defunded by the Legislature effective July 1, 2004, its wage orders remain in effect.  *Bearden v. U.S. Borax, Inc.,* 138 Cal. App. 4th 429, 434 (2006).

FIRST AMENDED COMPLAINT

EAST\180232303.2

1    adjudicates wage claims, pursuant to California Labor Code §§ 96 and 98, on behalf

2    of franchisees who file claims contending that they are employees misclassified as

3    independent contractors.

4           57.    Defendant Patrick Henning is the Director of the Employment

5    Development Department. The Employment Development Department is specifically

6    empowered by the Legislature to interpret and enforce the Unemployment Insurance

7    Code.  *See* Unemployment Ins. Code § 317.

8           58.    Defendants Rodriquez, Su, Hagen, Garcia-Bower, and Henning are sued

9    in their official capacities as representatives of California and as the officials

10   responsible for enforcing California's ABC Test.

## The Nature Of Franchising

12          59.    Until the Lanham Act was passed in 1946, licensing a trademark was

13   deemed a deceptive trade practice.  Once the Act was passed, a trademark could only

14   be licensed as long as the licensor "sufficiently policed and inspected its licensees'

15   operations to guarantee the quality of the products they sold under its trademarks to

16   the public." *Dawn Donut*, 267 F.2d at 367.

17          60.    The establishment of the right to license a trademark created the modern

18   franchise business model and has fueled the explosive growth of franchising over the

19   last seven decades.  That business model and the "contractual arrangement [that

20   underlies all franchised businesses] benefits both parties." *Patterson*, 60 Cal. 4th at

21   477.

22          61.    On the franchisor's side, the franchisor has the legal right under the

23   Lanham Act to license its trademark and its successful methods of conducting

24   business in association with the trademark, as long as it complies with state and

25   federal laws regulating the offer and sale of franchises.  In this way, franchising allows

26   franchisors to focus on the development of the know-how they license to their

27   franchisees, who pay royalties and fees for the right to use this know-how and "the

28

20

FIRST AMENDED COMPLAINT

1    right to sell products or services under the franchisor's name and trademark."

2    *Patterson*, 60 Cal. 4th at 489.

3        62.    On the franchisee's side, the franchisee acquires the right to associate a

4    business with an established trademark, obtains valuable know-how about the

5    franchisor's methods of operation, marketing plans, recipes, trade secrets, sources,

6    and brand standards.

7        63.    To ensure a consistent customer experience associated with a licensed

8    trademark, it is critical that brand standards are consistently enforced.  In a franchise

9    relationship, the controls necessary to establish and preserve brand consistency are

10   often extensive to ensure that customers receive all of the elements associated with

11   the licensed trademark.

12       64.    The consistency of a system's operations, service, and product quality

13   attracts customers and induces loyalty; customers become loyal if the experiences

14   they enjoy at diverse units of these chains routinely meet their expectations. Consumer

15   dissatisfaction at a single franchised location may be wrongfully attributed to the

16   entire system, thereby damaging the value of a franchisee's business, the goodwill

17   associated with the franchisor's brand, and the health of a franchise system as a whole.

18       65.    Franchise agreements are usually long-term agreements, often with

19   terms of ten or twenty years and often with renewal rights.  Under California

20   Corporations Code § 31125, it is generally unlawful to solicit the material

21   modification of an existing franchise relationship.

22       66.    For these reasons, the California Supreme Court has recognized that

23   "[t]he systemwide standards and controls [which franchisors establish] provide a

24   means of protecting the trademarked brand at great distances." *Patterson*, 60 Cal. 4th

25   at 490.

26       67.    In addition, franchisors offer their franchisees access to a tested

27   operational system.  As the California Supreme Court has observed, in addition to a

28

21

FIRST AMENDED COMPLAINT

license to use the franchisor's trademark, a franchisee "also acquires a business plan, which the franchisor has crafted for all of its stores.  This business plan requires the franchisee to follow a system of standards and procedures.  A long list of marketing, production, operational, and administrative areas is typically involved.  The franchisor's system can take the form of printed manuals, training programs, advertising services, and managerial support, among other things." *Patterson*, 60 Cal. 4th at 489-90 (emphasis omitted).

68.    Access to a franchisor's system creates significant operational efficiencies which are intended to reduce franchisee financial risks because, instead of having to create an entirely new business from the ground up, a franchisee has access to an established brand and business system and can trade on the consumer goodwill that the brand has generated as a result of the "control over the franchisees' method of operation" exercised by the franchisor.

69.    Notwithstanding the franchisor's establishment of a detailed operational system, the franchisee "retains autonomy as a manager and employer." *Patterson*, 60 Cal. 4th at 478.  "It is the franchisee who implements the operational standards on a day-to-day basis, hires and fires store employees, and regulates workplace behavior." *Id*.  In fact, franchisees retain complete control over the employees they choose to hire in their franchises.

70.    Indeed, franchisees do not embark on ownership and operation of franchised businesses as an "employee" of the franchisor.  Quite the contrary, franchisees obtain an independent business for their own benefit and for the benefit of the brand which receives support from franchisors that is not available in ostensibly comparable independent business ventures, subject to the aforesaid brand controls and applicable contract provisions.

71.    Virtually all franchise agreements allocate complete power of hiring, scheduling, supervising and firing workers at the franchised business to the

FIRST AMENDED COMPLAINT

franchisee.  It would be confusing and fundamentally disruptive to the commercial franchise business model if the contradictory rights and obligations of an employment relationship were imposed by operation of law upon the parties.  Franchisees do not want franchisors to tell them if and when they must work as employees and franchisors would breach their franchise agreements if they exercised such powers.  This is why franchisor and franchisee interests are aligned in seeking relief in this action.

## **Regulation of Franchising**

72.     Franchise arrangements are heavily regulated, both at the state and federal level.  Likewise, both state and federal law define what it means to be a "franchise."

73.     Under both state and federal law, control is an essential element of all franchised businesses.

74.     First, control is an element of the definition of "franchise" under federal law.  In this way, the FTC Franchise Rule defines which relationships may be considered "franchises."  If a relationship does not satisfy this definition, then, absent an otherwise applicable state law, prospective franchisees, including members of Plaintiffs, would not be entitled to the extensive pre-sale disclosures which the FTC Franchise Rule requires that a franchisor make.

75.     Under that Rule, a franchise is defined as "any continuing commercial relationship or arrangement, whatever it may be called, in which the terms of the offer or contract specify, or the franchise seller promises or represents, orally or in writing, that:

> (1)     The franchisee will obtain the right to operate a business that is identified or associated with the franchisor's trademark, or to offer, sell, or distribute goods, services, or commodities that are identified or associated with the franchisor's trademark;

FIRST AMENDED COMPLAINT

EAST\180232303.2

(2)     *The franchisor will exert or has authority to exert a significant degree of control over the franchisee's method of operation, or provide significant assistance in the franchisee's method of operation*; and

(3)     As a condition of obtaining or commencing operation of the franchise, the franchisee makes a required payment or commits to make a required payment to the franchisor or its affiliate.

FTC Franchise Rule, 16 C.F.R. § 436.1(h) (emphasis added).

76.     The same concept is reflected in the state statute which regulates the sale of franchises in this State.  The CFIL defines a "franchise" as a contract or agreement, either expressed or implied, whether oral or written, between two or more persons by which:

(1)     A franchisee is granted the right to engage in the business of offering, selling or distributing goods or services *under a marketing plan or system prescribed in substantial part by a franchisor*; and,

(2)     The operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate; and

(3)     The franchisee is required to pay, directly or indirectly, a franchise fee.

Cal. Corp. Code § 31005(a) (emphasis added).

77.     In fact, according to a release issued by the California Department of Financial Protection and Innovation, the agency responsible for regulating franchises, (Commissioner's Release 3-F, *available at* https://dfpi.ca.gov/commissioners-release-3-f/), "[i]f no marketing plan or system is prescribed and the franchisee is left entirely free to operate the business according to the franchisee's own marketing plan or system, the agreement is not a franchise."

FIRST AMENDED COMPLAINT

EAST\180232303.2

78.     Second, for a business relationship to constitute a "franchise" under the FTC Franchise Rule, the franchisee must obtain the right to use the franchisor's trademark or service mark.  The Lanham Act, in turn, obligates a licensor to exercise control over the use of its trademark(s).  The Lanham Act allows the use of a trademark by someone other than the owner *only* when the owner exercises sufficient control over the nature and quality of the goods or services sold under the trademark of the other.  The California Supreme Court and the Ninth Circuit Court of Appeals, in fact, have both recognized that a franchisor *must* have the freedom to "impose[] comprehensive and meticulous standards for marketing its trademarked brand and operating its franchises in a uniform way."  *Patterson*, 60 Cal. 4th at 478; *accord Salazar*, 939 F.3d at 1030.

79.     The control over the methods, systems, and processes of the business that licensors are required to exercise over the use of their trademarks benefits not just franchisors, but consumers, who rightly assume that goods and services provided under the same mark should carry the same level of quality.  Such control also benefits franchisees, who profit from the reputation and goodwill attached to the marks they have been licensed to use.

### California's ABC Test

80.     In April of 2018, the California Supreme Court issued its opinion in *Dynamex Operations W. Inc v. Superior Court*, 4 Cal. 5th 903 (2018).  *Dynamex* adopted a new test – the "ABC Test" – for determining whether a worker is an employee or independent contractor for purposes of the Wage Orders of the Industrial Welfare Commission, 8 Cal. Code Regs. § 11000 *et seq*.

81.     Under the ABC Test, a worker is properly considered an independent contractor to whom a Wage Order does not apply only if the hiring entity establishes each of the following three criteria:

EAST\180232303.2

(A)     that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of such work and in fact;

(B)     that the worker performs work that is outside the usual course of the hiring entity's business; and

(C)     that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity.

*Dynamex*, 4 Cal. 5th at 916-917.

82.     On September 11, 2019, the California Legislature passed AB-5, which, among other things, was intended to "codify the decision of the California Supreme Court in *Dynamex* and ... clarify the decision's application in state law."  Cal. Labor Code § 2750.3, *repealed by* Stats.2020, c.38 (A.B. 2257).  The law, which was signed by the Governor on or about September 18, 2019, makes the ABC Test applicable to the provisions of the Labor Code, the Unemployment Insurance Code, and the Wage Orders of the Industrial Welfare Commission.

83.     Under AB-5: "[A] person providing labor or services for remuneration shall be considered an employee rather than an independent contractor unless the hiring entity demonstrates that all of the following conditions are satisfied:

(A)     The person is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact;

(B)     The person performs work that is outside the usual course of the hiring entity's business; and

(C)     The person is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

FIRST AMENDED COMPLAINT

EAST\180232303.2

84.     AB-5 took effect on January 1, 2020.

85.     On September 4, 2020, the Governor signed AB-2257, which revised and recast the provisions of AB-5 and created certain exemptions.  Under AB-2257, the ABC Test applies to provisions of the Labor Code, the Unemployment Insurance Code, and the Wage Orders of the Industrial Welfare Commission.  AB-2257 took immediate effect on September 4, 2020.

**The Purposes of AB-5 Are Not Served by Applying it to Franchises**

86.     AB-5's stated intent is to address the "harm to misclassified workers who lose significant workplace protections, the unfairness to employers who must compete with companies that misclassify, and the loss to the state of needed revenue from companies that use misclassification to avoid obligations such as payment of payroll taxes, payment of premiums for workers' compensation, Social Security, unemployment, and disability insurance."  AB-5, § 1(b).

87.     The California Legislature enacted the ABC Test in order "to ensure workers who are currently exploited by being misclassified as independent contractors instead of recognized as employees have the basic rights and protections they deserve under the law…. By codifying the California Supreme Court's landmark, unanimous *Dynamex* decision, this act restores these important protections to potentially several million workers who have been denied these basic workplace rights that all employees are entitled to under the law."  AB-5, § 1(e).

88.     The franchise relationship is properly outside the ambit of California's ABC Test, which was implemented to ensure that workers who should properly be classified as employees have access to, among other things, workers compensation and unemployment benefits.  These kinds of employee benefits are not appropriate for franchisees who, by definition, are owners granted the "right to operate a business" (16 CFR 336.1(h)(1)).  Instead, as independent business owners, franchisees manage the operation of their businesses, control costs, hire, fire and supervise workers, keep

FIRST AMENDED COMPLAINT

their businesses' profits, have the right to sell their businesses, can access tax benefits like business-related deductions, and are eligible for programs for business owners, like the Paycheck Protection Program, that employees cannot access.  Franchise agreements typically specify that franchisees are responsible for their own employment decisions and give franchisees the day-to-day control necessary to operate their individual businesses, subject to limited controls designed to protect the brand and consumer goodwill.  Unlike employees, franchisees build equity in their businesses and benefit from that equity when franchisees sell their businesses.

89.     Because franchisees retain general control over the hiring, supervising and scheduling of any workers hired by their businesses, they are already required by law to pay appropriate payroll and withholding taxes on behalf of their employees, furnish them with workers' compensation insurance, and otherwise comply with wage and hour and other employee protections in accordance with state law and federal law. As the California Supreme Court has noted, the franchise sector already generates "billions of dollars" of payroll, and provides jobs to "millions of people" employed by franchisees.  *Patterson*, 60 Cal. 4th at 489.

## When Applied to Franchises, California's ABC Test is Preempted by the FTC Franchise Rule

90.     The FTC Franchise Rule authorizes and regulates the sale of franchises.

91.     Under the FTC Franchise Rule, franchise relationships and employment relationships are mutually exclusive – *i.e.* a franchise is not an employment relationship and an employment relationship is not a franchise.  The FTC Franchise Rule Compliance Guide states that employment relationships "are excluded from coverage."  *See*  https://www.ftc.gov/system/files/documents/plain-language/bus70-franchise-rule-compliance-guide.pdf.  As long ago as 1978, in the Statement of Basis and Purpose Relating to Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures, 43 Fed. Reg. 59614, 59623, the FTC

28

EAST\180232303.2

drew a distinction between employees and franchisees: "The popularity of franchising is, to a large extent, the result of the nature of franchising, a bringing together of persons who desire to be their own bosses with those who have an accepted product or a proven operating procedure and who have a need for expansion of capital and new management talent. Thus, franchising allows a firm to expand more rapidly than could be expected through internal growth, since it is designed to allow individuals to have more autonomy than mere employees while working at the same time with a profit incentive."  Cal. Labor Code § 2775(b)(1) disrupts and subverts the franchise relationship sanctioned by the FTC Franchise Rule by converting it into an employment relationship by operation of law, thereby impermissibly taking the relationship out of the purview of the FTC Franchise Rule (because employment relationships are not covered by the FTC Franchise Rule).

92.     By its express terms, the "A" Prong of California's ABC Test stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, including sanctioning and regulating the sale of non-employment relationships based upon the licensing of trademarks and meeting the definition of a franchise relationship.

93.     Under Prong B of the ABC Test, a person may not be classified as an independent contractor unless that person "performs work that is outside the usual course of the hiring entity's business."  Cal. Labor Code § 2775(b)(1)(B).  By definition, all franchisees are granted the right to operate a business that is identified or associated with the franchisor's trademark.  16 C.F.R. 436.1(h).

94.     If interpreted in accordance with its express terms, California's ABC Test removes all California franchises from the purview of the FTC Franchise Rule by operation of law because the FTC Franchise Rule does not apply to employment relationships.  It therefore stands as an obstacle to the accomplishment and execution

EAST\180232303.2

of the full purposes and objectives of Congress, including the authorization and regulation of the sale of franchises.

## When Applied to Franchises, California's ABC Test is Preempted by the Lanham Act

95.     One purpose and objective of the Lanham Act is to protect a trademark owner's investment in the trademark.  The Act specifically provides that "[t]he intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations." 15 U.S.C. § 1127.

96.     The Lanham Act established a statutory right to license the trademark, so long as the trademark owner maintains control over the quality of the goods and services sold under the trademark by the licensee.  Franchising is one such form of licensing.

97.     Congress expressed its intent to regulate Commerce in the Lanham Act, specifically creating a statutory right to license a trademark, as long as there is control over the goods or services associated with the licensed mark.  The Lanham Act expressly "protect[s] registered marks used in such commerce from interference by State, or territorial legislation."  15 U.S.C. § 1127.

98.     California's ABC Test is preempted with respect to the relationship between franchisors and franchisees because it "stand[s] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"

FIRST AMENDED COMPLAINT

EAST\180232303.2

(*Hillman v. Maretta*, 569 U.S. 483, 489 (2013)) including, without limitation, the protection of a trademark owner's investment in its trademark, its right to license the use of that mark, and its right and obligation to control the use of the mark.

99.     Franchising is fundamentally incompatible with the obligations that would be triggered if franchisees were deemed employees of franchisors under California's ABC Test.  For example, all franchise systems contemplate the franchisee will retain the profits and bear the losses of its own business.  However, the California Labor Code requires employers to indemnify their employees for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, meaning the franchisor (at least arguably) would need to bear the franchisee's losses and pay all business expenses.  Most franchise systems require franchisees to pay the franchisor an initial franchise fee and/or ongoing royalty fees in return for the rights and support that the franchisor provides to the franchisee.  However, the California Labor Code prohibits an employer from compelling any employee to patronize his employer in the purchase of anything of value, disrupting the franchise commercial business model.  Under the FTC Franchise Rule, the CFIL, and the CFRA, there is no franchise relationship unless the franchisee pays a franchise fee.  If a franchisee is transmuted into an employee by operation of law under Cal. Labor Code § 2775(b)(1), it would be unlawful to establish a franchise relationship in California.  Franchising already accounts for "billions of dollars" of payroll, and provides jobs to "millions of people" employed by franchisees.  *Patterson*, 60 Cal. 4th at 489.  Franchising is not a viable commercial business model if the franchisor must bear all the franchisee's losses and expenses and cannot charge any fees to the franchisee.

EAST\180232303.2

**When Applied to Franchises, California's ABC Test Unreasonably Burdens, Disrupts, and Threatens To Destroy the Franchise Model in Violation of the Commerce Clause**

100.   Throughout the United States, the commercial franchise relationship generates "trillions of dollars in total sales" and "billions of dollars" of payroll, and provides jobs to "millions of people" employed by franchisees. *Patterson*, 60 Cal. 4th at 489.

101.   State regulations like Cal. Labor Code § 2775(b)(1) violate the Commerce Clause of the United States Constitution if they place a substantial burden on interstate commerce that is "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 (1970).

102.   When applied in accordance with its express terms, the ABC Test in Cal. Labor Code § 2775(b)(1) unreasonably burdens, disrupts and threatens to destroy the commercial franchise relationship in California.  The burdens imposed on franchise relationships are clearly excessive in relation to the state's interest in protecting employees.

103.   Cal. Labor Code § 226.8 makes it unlawful to make any deductions from "compensation, for any purpose, including for goods, materials, space rental, services…."

104.   Cal. Labor Code § 2802 obligates an "employer" to reimburse an "employee" for all "expenses and losses."  Under Cal. Labor Code § 226.8(b), there is a fine of not less than $5,000 per violation.  If the franchise relationship is an employment relationship, franchisors are in direct and imminent danger of being required to pay for all expenses and losses of a franchised business and for statutory penalties.

105.   Cal. Labor Code § 2860 provides:  "Everything which an employee acquires by virtue of his employment, except the compensation which is due to him

FIRST AMENDED COMPLAINT

from his employer, belongs to the employer…."  Application of this provision to a commercial franchise relationship would be disruptive because it suggests that the goodwill of a franchise owned by a franchisee belongs to the franchisor.

106.   Employers are obligated to provide wage statements to "employees" under Cal. Labor Code § 226.  The statement must include total hours worked, including an hourly rate.  Anyone "who knowingly and intentionally participates or aids in the violation of any provision of Section 226 is guilty of a misdemeanor" and is subject to fines and imprisonment not to exceed one year.  Cal. Labor Code § 226.6.[9]  But franchisors are contractually barred from scheduling the hours or setting the rate of compensation for *any* worker at a franchised location, including the franchisee.

107.   Arbitration is commonly used to resolve franchise disputes.  Business & Professions Code § 20040 expressly allows for pre-dispute arbitration agreements in franchise relationships, as long as specific standards of fairness have been met.   Under certain circumstances, an employer, however, may not require an employee to sign an arbitration agreement.  *See* Cal. Labor Code § 432.6.  It is thus uncertain whether it is lawful for a franchisor to include an arbitration provision in a franchise agreement or a renewal franchise.

108.   Cal. Labor Code § 226.8 makes it unlawful to wilfully classify an individual as an independent contractor.   Virtually all franchise agreements characterize franchisees as independent contractors.   Under Sections 23 and 433 of the Labor Code, anyone violating this law is subject to criminal sanctions, including "imprisonment in a county jail, not exceeding six months, or . . . a fine not exceeding one thousand dollars ($1,000), or both."

---

[9]     Violations of certain other provisions of the Labor Code also constitute misdemeanors or different criminal offenses and subject violators to financial penalties.  *See*, *e.g*., Cal. Labor Code §§ 206.5, 216, 225.

EAST\180232303.2

109.   Under Cal. Labor Code § 232.5, no employer or manger "shall require any employee or applicant for employment to agree, in writing, to any term or condition which is known by such employer, or agent, manager, superintendent, or officer thereof to be prohibited by law."  Franchise agreements generally allocate commercial obligations between the parties in a manner that would likely violate the Labor Code if franchise relationships are converted into employment relationships by operation of law.

110.   Franchisors cannot make everyday business decisions fundamental to their businesses if they are obligated to comply with contradictory obligations imposed by the Labor Code.  Whether or not there is a threatened action against a franchisor, franchisors are unable to manage their businesses until a court determines that the ABC Test is not the right test for franchise relationships.

111.   When applied in accordance with its express terms, the ABC Test in Cal. Labor Code § 2775(b)(1) presents franchisors with a Hobson's choice:  either ignore the contractual arrangements with franchisees in order to comply with the various California Labor Code requirements applicable to employers, fail to comply with those requirements (and do so at the peril of potential civil liability, financial penalties, and criminal liability), or leave the California marketplace altogether.

112.   When applied in accordance with its express terms, the ABC Test in Cal. Labor Code § 2775(b)(1) imposes a substantial barrier to interstate and foreign commerce and disrupts a form of business relationship expressly enabled and allowed by federal law.  There are already franchise companies that are unwilling to enter into or remain in the California market due to the uncertainty and disruption caused by the overlay of employment rights and obligations over franchise relationships and may close off the California market to a large swath of franchisors who rely on franchisees to maintain their brand and to franchisees for whom the

franchise model provides the most-desirable means by which to own and operate their own business.

113.   The burdens imposed by application of the ABC Test to franchises clearly exceed any legitimate local benefit because there has never been any showing that franchisees who voluntarily enter into commercial franchise relationships are in any need of protection as to workers' compensation, minimum wage and other employment benefits under California law.

## FIRST CLAIM FOR RELIEF

### Declaratory Relief (28 U.S.C. section 2201)

114.   Plaintiffs incorporate by reference Paragraphs 1 through 112 of their Complaint, inclusive, as and for this Paragraph 113 as if fully set forth herein.

115.   Under the Supremacy Clause of the U.S. Constitution, Plaintiffs' members may not to be subjected to or punished under state laws that are preempted by federal law.  This Court has equitable authority to grant relief from state enactments that are preempted by federal law.  *See Armstrong*, 575 U.S. at 324.

116.   An actual controversy exists among the parties because Plaintiffs assert that the application of California's ABC Test to the relationship between franchisors and franchisees is preempted by federal law, specifically the FTC Franchise Rule and the Lanham Act, while Defendants assert it is not.

117.   Plaintiffs seek a declaration that the application of California's ABC Test to the relationship between franchisors and franchisees, as defined by the FTC Franchise Rule, is preempted by federal law, specifically the FTC Franchise Rule and the Lanham Act.

FIRST AMENDED COMPLAINT

## SECOND CLAIM FOR RELIEF

### (Excessive Burdens in Violation of the Commerce Clause)

118.   Plaintiffs incorporate by reference Paragraphs 1 through 116 of their Complaint, inclusive, as and for this Paragraph 117 as if fully set forth herein.

119.   When applied to franchise relationships in accordance with its express terms, Cal. Labor Code § 2775(b)(1) violates the Commerce Clause by imposing unreasonable burdens on interstate and foreign commerce that are clearly excessive when measured against any legitimate local benefits.

120.   The ABC Test in Cal. Labor Code § 2775(b)(1) substantially burdens and disrupts the franchise relationship and the interstate and international markets for it and, in fact, threatens to destroy it altogether because the ABC Test is incompatible with the franchise relationship.  A rule that imposes liability upon a franchisor because of control imposed over brand standards "would disrupt the franchise relationship." *Patterson,* 60 Cal. 4th at 498 (recognizing disruption from such a rule in the context of a vicarious liability claim).  The ABC Test fundamentally and impermissibly disrupts long-term, ongoing franchise relationships.

121.   The burdens imposed by an application of the ABC Test by its express terms clearly exceed any legitimate local benefit.  The workers who work for franchisees are the employees of the franchisees and receive their wage-and-hour and other employment benefits from the franchisees who employ them.  To the extent a franchisee chooses work within its own franchised business, he or she is acting within the greater context of a commercial franchise relationship, expressly sanctioned and governed by the Lanham Act, the FTC Franchise Rule, the CFIL, and the CFRA.  Unless the commercial franchise relationship is a fraud, the commercial rights and obligations of the parties are allocated between the parties in the terms of their franchise agreement.

EAST\180232303.2

122.   Defendants are purporting to act within the scope of their authority under State law in enforcing and implementing the ABC Test.

123.   Defendants are liable to Plaintiffs for proper redress under 42 U.S.C. § 1983 because the ABC Test deprives Plaintiffs and their members of the rights, privileges, and immunities secured by the United States Constitution.

124.   Plaintiffs have no adequate remedy at law.

## THIRD CLAIM FOR RELIEF

### Declaratory Relief (28 U.S.C. section 2201)

125.   Plaintiffs incorporate by reference Paragraphs 1 through 123 of their Complaint, inclusive, as and for this Paragraph 124 as if fully set forth herein.

126.   Under principles of statutory construction, statutes must be harmonized with each other.

127.   Cal. Labor Code § 2775(a)(3) provides, "If a court of law rules that the three-part test in paragraph (1) [the ABC Test] cannot be applied to a particular context based on grounds other than an express exception to employment status as provided under paragraph (2), then the determination of employee or independent contractor status in that context shall instead be governed by the California Supreme Court's decision in S. *G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341 (Borello)."

128.   An actual controversy exists among the parties.  Plaintiffs assert that the only way to harmonize Cal. Labor Code § 2775 with the CFIL, the CFRA, the Lanham Act and the FTC Rule is to hold that the ABC Test cannot be applied to the franchisor-franchisee relationship and that instead *Borello* governs.  Upon information and belief, Defendants disagree.

129.   Plaintiffs seek a declaration that the determination of employee or independent contractor status in the franchisor-franchisee context shall be governed by *Borello*.

FIRST AMENDED COMPLAINT

EAST\180232303.2

## FOURTH CLAIM FOR RELIEF

**(Regulatory Taking Under the Fifth and Fourteenth Amendments)**

130.   Plaintiffs incorporate by reference Paragraphs 1 through 129 of their Complaint, inclusive, as and for this Paragraph 130, as if fully set forth herein.

131.   When applied to franchise relationships in accordance with its express terms, Cal. Labor Code § 2775(b)(1) violates the Fifth and Fourteenth Amendments of the United States Constitution because California's ABC Test constitutes a regulatory taking of franchisor and franchisee contractual rights qualifying as independent contractor relationships.

132.   Franchise agreements are property subject to the Fifth and Fourteenth Amendments.  The imposition of California's ABC Test on franchise relationships materially interferes with distinct investment backed expectations of franchisors and franchisees, and imposes employment requirements where none were imposed, warranted or expected when the relationship was established: in effect, denying the benefits of a commercial contractual relationship and instead imposing employment relations and obligations.  The economic impact of California's ABC Test on franchise relationships goes too far and is thus devastating to the entire franchise industry, causing severe and substantially disproportionate liability on the franchise relationships, including retroactively, that could not have been anticipated within reasonable probability.

133.   Defendants are purporting to act within the scope of their authority under State law in enforcing and implementing California's ABC Test, including, without limitation, against putative employers by and through its administrative agencies, like the California Department of Labor ("DOL") and California's Employment Development Department ("EDD"), which expressly use California's ABC Test to audit and tax putative employers and penalize those it finds in non-compliance.

FIRST AMENDED COMPLAINT

EAST\180232303.2

California has not stated that franchising is exempt from DOL, EDD, or other administrative enforcement of the ABC Test.

134.   Defendants are liable to Plaintiffs for proper redress under 42 U.S.C. § 1983 because the ABC Test deprives Plaintiffs' members of the economically viable value of their property without due process, and the rights, privileges, and immunities secured by the United States Constitution.

## FIFTH CLAIM FOR RELIEF

### (Injunctive Relief)

135.   Plaintiffs incorporate by reference Paragraphs 1 through 134 of their Complaint, inclusive, as and for this Paragraph 135, as if fully set forth herein.

136.   Defendants should be preliminarily and permanently enjoined from applying California's ABC Test to the franchise relationship.

137.   Enforcement of California's ABC Test against the franchise relationship severely and irreparably harms Plaintiffs' members.  Absent an injunction, Plaintiffs' members will suffer severe and irreparable harm, which includes, without limitation, the risk of civil liability, criminal liability, and determinations which threaten the viability and goodwill of their businesses and their constitutional rights.  There is an imminent and immediate risk to all franchisors and franchisees in California because it is not possible to make every-day business decisions under the threat that the ABC Test may disrupt the franchise relationship.  Further, franchisors in California are exposed to the immediate threat of civil and criminal penalties for misclassification and violation of various Labor Codes.  Unlike an actual employer, no franchisor has the legal right to "re-classify" its franchisees as employees without breaching franchise agreements and violating California franchise laws.

138.   As a result, the Plaintiffs and their members have no adequate remedy at law.

FIRST AMENDED COMPLAINT

EAST\180232303.2

139.   Plaintiffs' and their members' injuries are preventable and redressable with appropriate injunctive relief that prevents Defendants from applying the ABC Test to the franchise relationship.

140.   The balance of harms weighs in favor of the entry of injunctive relief. Defendants cannot claim an interest in the enforcement of an unconstitutional law.

141.   The public interest also favors the entry of injunctive relief because the public is interested in the enforcement of constitutional rights and because franchising, and the continued viability of the franchise business model, is beneficial to the public and the California economy.

### **Prayer for Relief**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.   A declaration that, with respect to the relationship between franchisors and franchisees, as those terms are defined by the FTC's Franchise Rule, California's ABC Test is preempted by federal law;

B.   A preliminary and permanent injunction prohibiting Defendants, and any division, board, or commission within such Defendants, from applying California's ABC Test to the relationship between franchisors and franchisees;

C.   An order awarding Plaintiffs their costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

D.   Such other relief as this Court deems just and proper.

Respectfully submitted,

FIRST AMENDED COMPLAINT

EAST\180232303.2

DATED:  March 26, 2021

_/s/ **Karen C. Marchiano**_____
DLA PIPER LLP (US)
By: Karen C. Marchiano
Norman Leon

BRYAN CAVE LEIGHTON PAISNER LLP
Jonathan Solish
Jean-Claude André

Attorneys for Plaintiff International Franchise
Association

_/s/ **Grant A. Nigolian**_____
GRANT NIGOLIAN, P.C.
By: Grant A. Nigolian

MARKS & KLEIN LLP
Justin M. Klein
Andrew Bleiman

Attorneys for Plaintiffs International
Franchise Association Asian American Hotel
Owners Association, The Supercuts
Franchisee Association, and the DD
Independent Franchise Owners Association

41

FIRST AMENDED COMPLAINT

EAST\180232303.2