Nancy Nguyen Sims (SBN 215869)
nancy.sims@dlapiper.com
**DLA PIPER LLP (US)**
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, California 90067-4704
Tel:   310.595.3000

Norman Leon (pro hac vice
  forthcoming)
**DLA PIPER LLP (US)**
norman.leon@dlapiper.com
444 West Lake Street, Suite 900
Chicago, IL 60606-0089
Tel: 312.368.4000

Jonathan C. Solish (CA SBN 67609)
Jonathan.solish@bclplaw.com
**BRYAN CAVE LEIGHTON PAISNER LLP**
120 Broadway, Suite 300
Santa Monica, CA 90401-2386
Tel: 310.576.2100

*Attorneys for Plaintiff*
*INTERNATIONAL FRANCHISE ASSOCIATION*

Grant A. Nigolian (CA SBN 184101)
grant@gnpclaw.com
**GRANT NIGOLIAN, P.C.**
695 Town Center Drive, Suite 700
Costa Mesa, CA 92626
Tel: 310.853.2777

Justin M. Klein (pro hac vice forthcoming)
justin@marksklein.com
**MARKS & KLEIN LLP**
63 Riverside Avenue
Red Bank, NJ 07701
Tel: 732.747.7100

*Attorneys for Plaintiffs*
*INTERNATIONAL FRANCHISE ASSOCIATION, ASIAN AMERICAN HOTEL OWNERS ASSOCIATION, THE SUPERCUTS FRANCHISEE ASSOCIATION, and the DUNKIN' DONUTS INDEPENDENT FRANCHISE OWNERS ASSOCIATION*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERNATIONAL FRANCHISE ASSOCIATION, ASIAN AMERICAN HOTEL OWNERS ASSOCIATION, SUPERCUTS FRANCHISEE ASSOCIATION, and the DUNKIN' DONUTS INDEPENDENT FRANCHISE OWNERS ASSOCIATION, <br><br> Plaintiffs, <br><br> v. <br><br> STATE OF CALIFORNIA et al., <br><br> Defendants. | CASE NO. 3:20-CV-02243-BAS-DEB <br><br> **[CORRECTED] PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY** |

Pursuant to this Court's Order Granting Plaintiffs International Franchise Association, Asian American Hotel Owners Association, The Supercuts Franchisee Association, and The Dunkin' Donuts Independent Franchise Owners Association's (collectively, "Plaintiffs") *Ex Parte* Application for Leave to File Notice of Supplemental Authority dated October 18, 2021 (ECF Doc. No. 30), Plaintiffs hereby give notice of the following two supplemental authorities, in support of their Opposition to Defendants' pending Motion to Dismiss.

1. ***Patel v. 7-Eleven, Inc.***
**No. 20-1999, 2021 WL 3486175 (1st Cir. Aug. 9, 2021)**

Plaintiffs' Opposition cited *Patel v. 7-Eleven, Inc.*, 485 F. Supp. 3d 299 (D. Mass. 2020), a decision from the United States District Court for the District of Massachusetts which held that Massachusetts' Independent Contractor Law, Mass. Gen. Laws ch. 149, § 148B—which California adopted in *Dynamex Operations W. v. Superior Court*, 4 Cal. 5th 903 (2018)—did not apply to franchised businesses.  This supplemental authority is the recent decision by the United States Court of Appeals for the First Circuit in the appeal of the *Patel* case cited in Plaintiff's Opposition.

2. ***Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am.***
**6 F.4th 983 (9th Cir. July 27, 2021)**

In this case, the Ninth Circuit re-affirmed the principle that "'an organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose.'"  *Ranchers*, 6 F.4th 983 (quoting *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021).

/ / /

/ / /

/ / /

1            Copies of the above cases are attached hereto as Exhibits A and B, respectively.

2

3     Dated:  October 21, 2021          Respectfully submitted,

4

5                                       *s/ Nancy Nguyen Sims*
                                        DLA PIPER LLP (US)

6                                       By:   Norman Leon
7                                             Nancy Nguyen Sims

8                                       *s/ Jonathan Solish*
9                                       BRYAN CAVE LEIGHTON PAISNER LLP

10                                      Jonathan Solish

11                                      *Attorneys for Plaintiff*
                                        *International Franchise Association*
12

13                                      */s/ Grant A. Nigolian*
14                                      GRANT NIGOLIAN, P.C.

15                                      By:   Grant A. Nigolian

16                                      *s/ Justin Klein*
                                        MARKS & KLEIN LLP
17
                                        Justin M. Klein
18
                                        *Attorneys for Plaintiffs International*
19                                      *Franchise Association Asian American Hotel*
                                        *Owners Association, The Supercuts*
20                                      *Franchisee Association, and the Dunkin'*
                                        *Donuts Independent Franchise Owners*
21                                      *Association*

22

23

24

25

26

27

28

[CORRECTED] PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY

# EXHIBIT "A"

2021 WL 3486175
Only the Westlaw citation is currently available.
United States Court of Appeals, First Circuit.

Dhananjay **PATEL**, Safdar Hussain, Vatsal
Chokshi, Dhaval **Patel**, and Niral **Patel**, on behalf
of themselves and all others similarly situated,
Plaintiffs, Appellants,
v.
**7-ELEVEN**, INC., Defendant, Third-Party
Plaintiff, Appellee,
Mary Carrigan; Andrew Brothers, Defendants,
DP Milk Street Inc.; DP Jersey Inc.; DP Tremont
Street Inc.; DPNEWT01, Third-Party Defendants.

No. 20-1999
|
August 9, 2021

**Synopsis**
**Background:** Convenience store franchisees filed putative class action claiming that franchisor misclassified them as independent contractors rather than as employees, in violation of Massachusetts Independent Contractor Law (ICL), Massachusetts Wage Act, and Massachusetts Minimum Wage Law. The United States District Court for the District of Massachusetts, Nathaniel M. Gorton, J., 485 F.Supp.3d 299, denied franchisees' motion to certify class and granted franchisor summary judgment. Franchisees appealed.

**[Holding:]** The Court of Appeals held that question would be certified as to whether ICL's independent contractor test applied to franchisor that was required to comply with Federal Trade Commission's (FTC) Franchise Rule.

Question certified.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment; Certified Question.

West Headnotes (1)

**[1]**    **Federal Courts**⬦**Particular questions**

In putative class action by franchisees claiming that franchisor misclassified them as independent contractors in violation of Massachusetts Independent Contractor Law (ICL), question would be certified to Massachusetts Supreme Judicial Court as to whether three-prong test for independent contractor status set forth in ICL applied to relationship between franchisor and its franchisee, where franchisor was also required to comply with Federal Trade Commission's (FTC) Franchise Rule. Mass. Gen. Laws Ann. ch. 149, § 148B; 16 C.F.R. § 436.1(h).

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Nathaniel M. Gorton, U.S. District Judge]

**Attorneys and Law Firms**

Shannon Liss-Riordan, with whom Michelle Cassorla, Tara Boghosian, and Lichten & Liss-Riordan, P.C. were on brief, for the appellants, Dhananjay Patel, Safdar Hussain, Vatsal Chokshi, Dhaval Patel, and Niral Patel.

Norman M. Leon, with whom Matthew J. Iverson, Jennifer C. Brown, Jamie Kurtz, and DLA Piper LLP were on brief, for appellee 7-Eleven.

Before Thompson, Selya, and Hawkins,[*] Circuit Judges.

**Opinion**

PER CURIAM.

**\*1** The plaintiffs are a putative class of franchisees who sued 7-Eleven for violations of Massachusetts wage laws. For reasons we explain below, the outcome of this appeal hinges on a question of Massachusetts law, upon which the Massachusetts courts have not spoken. Therefore, we certify a question to the Massachusetts Supreme Judicial Court ("SJC") pursuant to Massachusetts Supreme Judicial Court Rule 1:03. See Fortin v. Titcomb, 671 F.3d 63, 66 (1st Cir. 2012). Some context for this question and the question itself follow.

Patel v. 7-Eleven, Inc., --- F.4th ---- (2021)

## BACKGROUND

We begin with a basic recitation of the facts from the summary judgment record, sharing only enough so that all may understand our decision to certify this question to the SJC. The plaintiffs own 7-Eleven franchises and accordingly operate 7-Eleven branded convenience stores in Massachusetts. Per the terms of their franchise agreements, the plaintiffs are obligated to operate their convenience stores around the clock, stock inventory sold by 7-Eleven's preferred vendors, utilize the 7-Eleven payroll system to pay store staff, and adhere to a host of other guidelines within the franchise agreement. The plaintiffs, as franchisees, are classified by the franchise agreement as independent contractors and do not receive a regular salary. Instead, each plaintiff may draw pay from their store's gross profits, after paying various fees required by the franchise agreement to 7-Eleven for the privilege of doing business with it. Finding this arrangement to be suboptimal, the plaintiffs sued 7-Eleven, alleging it misclassified them as independent contractors, rather than employees, in violation of the Massachusetts Independent Contractor Law ("ICL"), Mass. Gen. Laws ch. 149, § 148B, the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148, and the Massachusetts Minimum Wage Law, Mass. Gen. Laws ch. 151, §§ 1, 7.

The Massachusetts ICL presumes "an individual performing any service" to be an employee, and therefore protected by relevant wage and hour laws, unless that individual's alleged employer can demonstrate that:

> (1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and (2) the service is performed outside the usual course of the business of the employer; and, (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

Mass. Gen. Laws ch. 149, § 148B(a). At the federal level, the Federal Trade Commission has promulgated a collection of applicable regulations, known together as the "FTC Franchise Rule," 16 C.F.R. § 436.1, et seq., in order "to prevent deceptive and unfair practices in the sale of franchises and business opportunities and to correct consumers' misimpressions about franchise and business opportunity offerings." 72 Fed. Reg. 15444-01 (Mar. 30, 2007). As relevant here, the FTC Franchise Rule defines a franchise, in part, as a commercial relationship where the parties agree that, among other things, "[t]he franchisor will exert or has authority to exert a significant degree of control over the franchisee's method of operation, or provide significant assistance in the franchisee's method of operation." 16 C.F.R. § 436.1(h).

**\*2** Considering the text of each of the above-cited provisions, there appears to be a conflict between the Massachusetts ICL and the "exert[ing] ... control" prong of the FTC Franchise Rule. It appears difficult, if not impossible, for a franchisor to satisfy the FTC Franchise Rule's requirement that the franchisor "exert or ha[ve] authority to exert a significant degree of control over the franchisee's method of operation" and simultaneously rebut the Massachusetts ICL's employee presumption by demonstrating that each franchisee is "free from control and direction in connection with the performance of the service." We are mindful, of course, that a franchisor may not exert any degree of control and instead may "provide significant assistance in the franchisee's method of operation."[1] See 16 C.F.R. § 436.1(h). Such a franchising model may or may not implicate any of the concerns at issue in this case.

7-Eleven argues (and the district court so held) that the conflict between the ICL and the FTC Franchise Rule make it impossible for 7-Eleven to satisfy federal law and demonstrate that, due to this conflict, the ICL does not apply and its franchisees are therefore properly classified as independent contractors. Therefore, 7-Eleven reasons, the ICL does not apply, as a matter of law, to its relationship with its franchisees. The plaintiffs naturally disagree and reason that 7-Eleven has the same burden as any other purported employer under the ICL and, the plaintiffs press, 7-Eleven has failed to meet that burden.

The SJC has yet to analyze the interactions between the ICL and the FTC Franchise Rule. The closest decision, as far as we can tell, is from a case where the SJC considered the overlap between a Massachusetts real estate statute and the ICL and held that the ICL did not apply, as a matter of law, to the workers in that case because the real estate statute made it impossible for purported employers to also satisfy one or more of the

ICL's prongs. *See* Monell v. Boston Pads, LLC, 471 Mass. 566, 31 N.E.3d 60 (2015). However informative this analysis may be, we do not read the decision in Monell, without further elaboration, to decide the issue presented in this case. While we are aware of other tools at our disposal for resolving this question, we consider the most prudent approach to be to give the SJC the first opportunity to weigh in on this issue.

Plus, there are unique policy interests at stake, specific to Massachusetts, that also counsel toward certification. The resolution of a question involving the ICL impacts untold sectors of workers and business owners across the Commonwealth. Though we often resolve questions of state law that affect many, certification is more appropriate here because "[t]his is also not a case in which the 'policy arguments line up solely behind one solution.' " In re Engage, Inc., 544 F.3d 50, 57 (1st Cir. 2008), certified question answered sub nom. Ropes & Gray LLP v. Jalbert, 454 Mass. 407, 910 N.E.2d 330 (2009) (quoting Boston Gas Co. v. Century Indem., 529 F.3d 8, 12, 14 (1st Cir. 2008)).

## CERTIFICATION

In light of the forgoing, we certify the following question to the Massachusetts Supreme Judicial Court:

(1) Whether the three-prong test for independent contractor status set forth in Mass. Gen. Laws ch. 149 § 148B applies to the relationship between a franchisor and its franchisee, where the franchisor must also comply with the FTC Franchise Rule.

We would welcome any further guidance from the Supreme Judicial Court on any other relevant aspect of Massachusetts law that it believes would aid in the proper resolution of the issues presented here.

The clerk of this court is directed to forward to the Massachusetts Supreme Judicial Court, under the official seal of this court, a copy of the certified question, this opinion, the district court's opinion, and the merits briefs and appendices filed by the parties. We retain jurisdiction over this case pending resolution of this certified question.

## All Citations

--- F.4th ----, 2021 WL 3486175

## Footnotes

\*    Of the Court of Appeals for the Ninth Circuit, sitting by designation.

1    7-Eleven appears, at least for the purposes of the instant summary judgment motion, to operate under the "exert[ing] ... control" business model.

     © 2021 Thomson Reuters. No claim to original U.S. Government Works.

  © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT "B"

6 F.4th 983
United States Court of Appeals, Ninth Circuit.

RANCHERS CATTLEMEN ACTION LEGAL
FUND UNITED STOCKGROWERS OF AMERICA,
a Montana Corporation, Plaintiff-Appellant,

v.

Thomas VILSACK, in his Official Capacity
as Secretary of Agriculture; United States
Department of Agriculture, Defendants-Appellees,

Montana Beef Council; Nebraska Beef Council;
Pennsylvania Beef Council; Texas Beef
Council; Lee Cornwell; Gene Curry; Walter J.
Taylor, Jr., Intervenor-Defendants-Appellees.

No. 20-35453
|
Argued and Submitted June
10, 2021 Portland, Oregon
|
Filed July 27, 2021

**Synopsis**
**Background:** Organization of cattle producers brought action
against United States Department of Agriculture (USDA),
Secretary of Agriculture, and qualified state beef councils,
alleging unconstitutional compelled subsidy of private speech
arising from councils' use of third parties to produce
beef advertisements with funds that councils received from
mandatory assessments on cattle sales under Beef Promotion
and Research Act. The United States District Court for the
District of Montana, Brian M. Morris, Chief Judge, 449
F.Supp.3d 944, adopted report and recommendation of John
Johnston, United States Magistrate Judge, 2020 WL 2477662,
and granted summary judgment for defendants. Organization
appealed.

**Holdings:** The Court of Appeals, Hurwitz, Circuit Judge, held
that:

[1] organization had standing;

[2] speech of councils and third parties was government
speech; and

[3] a permanent injunction to continue Secretary's
memoranda of understanding (MOU) with councils was
unnecessary.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment; Motion for Permanent Injunction.

West Headnotes (11)

**[1]    Constitutional Law ⚖ Freedom of Speech,
Expression, and Press**

Organization of cattle producers had
associational standing to sue qualified state beef
councils to which its members paid mandatory
assessments, or beef checkoff funds, on cattle
sales under Beef Promotion and Research Act,
for unconstitutional compelled subsidy of private
speech arising from councils' transfers of portion
of funds to third parties to produce beef
advertisements. U.S. Const. Amend. 1; 7
U.S.C.A. §§ 2901(b), 2904(8)(C); 7 C.F.R. §
1260.172(a)(3).

**[2]    Associations ⚖ Injury or interest in general**

An organization has direct standing to sue where
it establishes that the defendant's behavior has
frustrated its mission and caused it to divert
resources in response to that frustration of
purpose.

**[3]    Associations ⚖ Causation and redressability
in general**

An organization cannot manufacture the injury
for purposes of direct standing to sue by
incurring litigation costs or simply choosing to
spend money fixing a problem that otherwise
would not affect the organization at all, but the
organization can show it would have suffered
some other injury had they not diverted resources
to counteracting the problem.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Ranchers Cattlemen Action Legal Fund United Stockgrowers of..., 6 F.4th 983 (2021)

21 Cal. Daily Op. Serv. 7548, 2021 Daily Journal D.A.R. 7584

**[4]**   **Constitutional Law** 🔑 Freedom of Speech, Expression, and Press

Organization of cattle producers had direct standing to sue qualified state beef councils to which its members did not pay mandatory assessments, or beef checkoff funds, on cattle sales under Beef Promotion and Research Act, for alleged unconstitutional compelled subsidy of private speech arising from councils' transfers of portion of funds to third parties to produce beef advertisements, where organization's mission included protecting domestic, independent cattle producers, organization used some 60% of its resources to educate producers on use of checkoff funds by beef councils, beef checkoff program affected that mission, and organization devoted resources, independent of expenses for litigation, to deal with program. U.S. Const. Amend. 1; 7 U.S.C.A. §§ 2901(b), 2904(8)(C); 7 C.F.R. § 1260.172(a)(3).

**[5]**   **Constitutional Law** 🔑 Compelled or forced speech, support, or participation

Critical question in determining whether speech is public or private for purposes of a First Amendment claim of compelled support of speech is whether the speech is effectively controlled by the government. U.S. Const. Amend. 1.

**[6]**   **Agriculture** 🔑 Marketing and Production Control in General; Quotas and Allotments

**Constitutional Law** 🔑 Agricultural product marketing and assessments

**Constitutional Law** 🔑 Agricultural product marketing and assessments

Memoranda of understanding (MOU) between Secretary of Agriculture and qualified state beef councils gave Secretary sufficient control over beef promotional program funded by mandatory assessment on cattle sales under Beef Promotion and Research Act to make councils' speech, and speech of third parties they paid to produce advertisements and other promotional materials, effectively government speech, and thus mandatory assessments were not unconstitutional compelled subsidy of private speech, where Secretary had final approval authority under MOUs over every word used in every promotional campaign, and Secretary had both unquestioned control of flow of assessment funds to councils and threat of decertification under MOUs and regulations if Secretary disapproved of use of funds. U.S. Const. Amend. 1; 7 U.S.C.A. §§ 2901(b), 2904(8)(C); 7 C.F.R. § 1260.172(a)(3); 7 C.F.R. § 1260.169(a).

**[7]**   **Federal Courts** 🔑 Voluntary cessation of challenged conduct

Voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case unless it can be said with assurance that there is no reasonable expectation that the alleged violation will recur and interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.

**[8]**   **Federal Courts** 🔑 Voluntary cessation of challenged conduct

The government receives greater deference than a private party when a court analyzes voluntary cessation of allegedly illegal conduct as a mootness issue.

**[9]**   **Federal Courts** 🔑 Voluntary cessation of challenged conduct

The government must demonstrate that the change in its behavior is entrenched or permanent to establish that its voluntary cessation of the behavior renders the claim against it moot; it must be absolutely clear to the court, considering the procedural safeguards insulating the new state of affairs from arbitrary reversal and the government's rationale for its changed practices, that the activity complained of will not reoccur.

Ranchers-Cattlemen Action Legal Fund United Stockgrowers of..., 6 F.4th 983 (2021)

21 Cal. Daily Op. Serv. 7548, 2021 Daily Journal D.A.R. 7584

**[10]**   **Injunction**   Mootness and ripeness; ineffective remedy

Memoranda of understanding (MOU) that Secretary of Agriculture and qualified state beef councils entered into during pendency of litigation alleging unconstitutional compelled subsidy of private speech with respect to beef promotional program funded by mandatory assessment on cattle sales were an entrenched change in prior status quo that mooted need for permanent injunction requiring continuation of MOUs to prevent risk that current policy would be undone, absent any evidence that Secretary intended to withdraw from MOUs. U.S. Const. Amend. 1; 7 U.S.C.A. §§ 2901(b), 2904(8)(C); 7 C.F.R. § 1260.172(a)(3); 7 C.F.R. § 1260.169(a).

**[11]**   **Administrative Law and Procedure**   Legislative rules; substantive rules

**Administrative Law and Procedure**   Notice and comment in general

A memorandum of understanding (MOU) with an administrative agency is not a legislative rule for which notice and comment is required.

Appeal from the United States District Court for the District of Montana, Brian M. Morris, District Judge, Presiding, D.C. No. 4:16-cv-00041-BMM

**Attorneys and Law Firms**

David S. Muraskin (argued), Public Justice P.C., Washington, D.C.; William A. Rossbach, Rossbach Law P.C., Missoula, Montana; J. Dudley Butler, Butler Farm & Ranch Law Group PLLC, Benton, Mississippi; for Plaintiff-Appellant.

Lindsey Powell (argued) and Michael S. Raab, Appellate Staff; Civil Division, United States Department of Justice, Washington, D.C.; Ryan M. Majerus, Senior Counsel; Stephen A. Vaden, General Counsel; United States Department of Agriculture, Washington, D.C.; for Defendants-Appellees.

Jean-Claude André (argued), Bryan Cave Leighton Paisner LLP, Santa Monica, California; Bryan J. Harrison, Bryan Cave Leighton Paisner LLP, Washington, D.C.; Robert M. Thompson and Mollie E. Harmon, Bryan Cave Leighton Paisner LLP, Kansas City, Missouri; Randy J. Cox, Boone Karlberg P.C., Missoula, Montana; for Intervenor-Defendants-Appellees.

Tyler Lobdell and Tarah Heinzen, Food & Water Watch, Washington, D.C., for Amici Curiae Food & Water Watch, Dakota Rural Action, Family Farm Action Alliance, Farm and Ranch Freedom Alliance, Institute for Agriculture and Trade Policy, Iowa Citizens for Community Improvement, Rural Advancement Foundation International USA, and Western Organization of Resource Councils.

Before: Kim McLane Wardlaw, Richard C. Tallman, and Andrew D. Hurwitz, Circuit Judges.

**OPINION**

HURWITZ, Circuit Judge:

This case involves a challenge by the Ranchers-Cattlemen Action Legal Fund ("R-CALF") to mandatory assessments on cattle sales imposed by federal law used to fund advertisements for beef products. The Montana Beef Council ("MBC") and other qualified state beef councils ("QSBCs") receive a portion of the assessments to fund promotional activities and some of these QSBCs direct a portion of these funds to third parties. The dispositive question is whether the speech generated by the third parties is government speech and therefore exempt from First Amendment scrutiny. The district court so held and entered summary judgment against R-CALF. We affirm.

I

A

The Beef Promotion and Research Act of 1985 ("Beef Act") imposes a $1 assessment, or "checkoff," on each head of cattle sold in the United States to fund consumption promotions to "maintain and expand domestic and foreign markets and uses for beef and beef products." 7 U.S.C. §§ 2901(b), 2904(8)(C). The Secretary of Agriculture

oversees the beef checkoff program through the Cattlemen's Beef Promotion and Research Board (the "Beef Board"), whose members the Secretary appoints. *Id.* § 2904(1). [1] A QSBC typically collects the checkoff, retaining 50 cents to fund state marketing efforts, and forwarding the remainder to the federal program. *Id.* § 2904(8)(C); 7 C.F.R. § 1260.172(a)(3). Producers may, however, opt out of funding their QSBC and direct the entire assessment to the federal program. *See* Beef Promotion and Research, 84 Fed. Reg. 20,765, 20,766–67 (May 13, 2019).

[1]   The Beef Board elects ten members to the Beef Promotion Operating Committee; a federation of QSBCs elects the other ten members. 7 U.S.C. § 2904(4)(A). The Operating Committee develops promotional campaigns for the Beef Board. *See* 7 U.S.C. § 2904(4)(B).

Since 2016, the Secretary, through the Agricultural Marketing Service ("AMS"), has entered into memoranda of understanding ("MOUs") with QSBCs. The MOUs grant the Secretary pre-approval authority over "any and all promotion, advertising, research, and consumer information plans and projects." The Secretary also reviews and approves the QSBCs' budgets and marketing plans, which detail their anticipated expenses and disbursements, and government officials can participate in QSBC board meetings at which promotional and funding decisions are made. The MOUs allow the Secretary to decertify a noncompliant QSBC, thereby terminating its access to checkoff funds.

Using checkoff funds, QSBCs can hire private third parties to produce advertisements and other promotional materials. Some engagements involve contracts. Under the MOUs, the Secretary must pre-approve all contracts and any plans or projects developed under them. The parties agree that third-party speech generated pursuant to these contracts is government speech.

But QSBCs can also make noncontractual transfers of checkoff funds to third parties to produce promotional materials. Materials produced by this funding method need not be pre-approved. Recipients of these transfers must identify their expenditures in an "annual accounting" and abide by the principles of the Beef Act—promoting beef without being unfair, deceptive, or political. The primary issue on appeal is whether speech made by third parties under these arrangements is effectively government speech.

**B**

R-CALF's members include cattle producers who object to their QSBCs' advertising campaigns. R-CALF first challenged the checkoff program in 2016, alleging that the distribution of funds to the MBC under the federal program is an unconstitutional compelled subsidy of private speech. While that litigation was pending, the MBC entered into an MOU with the Secretary. Without considering the MOU, the district court entered a preliminary injunction preventing the use of checkoff funds for promotional campaigns absent the producers' consent. A divided panel affirmed the preliminary injunction; the majority expressly declined to consider the effect of the MOU. *R-CALF v. Perdue*, 718 F. App'x 541, 542 n.1 (9th Cir. 2018). The dissent opined that the MOU "plainly grants the Secretary complete pre-approval authority over 'any and all promotion, advertising, research, and consumer information plans and projects' of the MBC," and therefore would have vacated the preliminary injunction. *Id.* at 543 (Hurwitz, J., dissenting) (quoting *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 560, 125 S.Ct. 2055, 161 L.Ed.2d 896 (2005)).

On remand, R-CALF amended its complaint to seek relief against fourteen additional QSBCs, all of which had MOUs with the Secretary. Four QSBCs and three producers intervened to defend the program. The district court granted summary judgment to the Secretary and intervenors, adopting a magistrate judge's proposed findings of fact and conclusions of law.

The district court found that R-CALF had standing to sue. But it concluded that the MOUs gave the Secretary sufficient control over the promotional program to make the QSBCs' speech—and the speech of third parties they paid—effectively government speech. It also rejected R-CALF's request for an injunction to ensure the Secretary continues to enforce the terms of the MOUs. R-CALF timely appealed.

**II**

[1]   We agree with the district court that R-CALF has associational standing to sue the twelve QSBCs to which its members pay checkoffs. But R-CALF concedes that it lacks such standing to challenge the use of checkoff funds by

QSBCs in states where none of its members pay checkoffs—Hawaii, South Carolina, and Vermont. Thus, R-CALF must establish direct standing to sue those three QSBCs.

**[2]  [3]**  "[A]n organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021). "Of course, organizations cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all, but they can show they would have suffered some other injury had they not diverted resources to counteracting the problem." *Id.* (cleaned up); *see also Am. Diabetes Ass'n v. U.S. Dep't of the Army*, 938 F.3d 1147, 1154–55 (9th Cir. 2019) (collecting cases).

**[4]**  R-CALF's mission includes "protecting domestic, independent cattle producers." R-CALF uses some 60% of its resources to educate producers on the use of checkoff funds by QSBCs. The beef checkoff program affects that mission and R-CALF has devoted (and continues to devote) resources, independent of expenses for this litigation, to deal with the program that might otherwise be used in support of that mission. *See Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (en banc) (spending "time and resources" to "meet" with impacted individuals that kept from other "core organizing activities" established standing); *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) ("divert[ing] resources to educational programs" established standing). Moreover, if R-CALF did not pursue this litigation, the QSBCs would have continued to use funds in a way that would frustrate R-CALF's organizational mission by allegedly "promot[ing] corporate consolidation in the beef industry." *See E. Bay Sanctuary*, 993 F.3d at 663. We therefore find that R-CALF has direct standing to pursue this litigation against the three QSBCs to which none of its members pay checkoffs.

### III

### A

**[5]**  The critical question in determining whether speech is public or private is whether the speech is "effectively controlled" by the government. *Johans*, 544 U.S. at 560, 125 S.Ct. 2055. In *Johans*, the Supreme Court upheld the federal portion of the beef checkoff program against a compelled-speech attack because "the government sets the overall message to be communicated and approves every word that is disseminated." *Id. at 562, 125 S.Ct. 2055*. *Johans* "emphasized three overlapping aspects" of the federal program: (1) "Congress directed the establishment of the program itself, including its promotional activities," (2) "Congress and the Secretary specify the general content of the promotional campaigns," and (3) "the Secretary 'exercises final approval authority over every word used in every promotional campaign.' " *Paramount Land Co. LP v. Cal. Pistachio Comm'n*, 491 F.3d 1003, 1009–10 (9th Cir. 2007) (quoting *Johans*, 544 U.S. at 560–61, 563, 125 S.Ct. 2055); *see also Delano Farms Co. v. Cal. Table Grape Comm'n*, 586 F.3d 1219, 1226–27 (9th Cir. 2009) (identifying the same factors).

Applying the *Johans* factors, this Court has twice issued opinions upholding mandatory assessment programs against First Amendment attacks.[2] *Paramount Land* refused to enjoin as unconstitutional a California statute providing subsidies from assessments on pistachio sales to the California Pistachio Commission because the State had specified the overall goal of the program—to promote pistachio sales—and exercised control over messaging. *491 F.3d at 1010–12*. The Commission, comprised of nine members, only one of whom was named by the State, was required to submit to the State for concurrence "an annual statement of contemplated activities ... including advertising, promotion, marketing research, and production research." *Id. at 1010* (quoting Cal. Food & Agric. Code § 69051(q)). Noting that the State had "less control" over the Commission than the Secretary exercised over the Beef Board, the *Paramount* panel nonetheless concluded that "[t]o draw a line between these two approaches to oversight risks micro-managing legislative and regulatory schemes, a task federal courts are ill-equipped to undertake." *Id. at 1011–12*.

---

2    In an unpublished decision, this Court also upheld mandatory assessments on rental car transactions.

See *In re Tourism Assessment Fee Litig.*, 391 F. App'x 643, 645–46 (9th Cir. 2010).

*Delano Farms* upheld similar compulsory assessments on California table grape growers, citing a state legislative directive that went "much further in defining the Commission's message than the Beef Act" along with the State's power to appoint and remove all California Table Grape Commissioners. 586 F.3d at 1225, 1228, 1230. The Court reached this conclusion despite recognizing that the statute did "*not require* any type of review by the [State] over the actual messages promulgated by the Commission." *Id.* at 1229.

B

**[6]**  This case is similar to *Paramount Land* and *Delano Farms*. Under the MOUs, QSBCs must submit "for pre-approval" by the Secretary "any and all promotion, advertising, research, and consumer information plans and projects"[3] and "any and all potential contracts or agreements to be entered into by [QSBCs] for the implementation and conduct of plans or projects funded by checkoff funds."[4] QSBCs must also submit "an annual budget outlining and explaining ... anticipated expenses and disbursements" and a "general description of the proposed promotion, research, consumer information, and industry information programs contemplated." *See Paramount Land*, 491 F.3d at 1010 (noting that the Pistachio Commission must submit "an annual statement of contemplated activities ... including advertising, promotion, marketing research, and production research" (quoting Cal. Food & Agric. Code § 69051(q))). Failure to comply can lead to de-certification of the QSBCs by the Secretary. This establishes, as in the federal program, "final approval authority over every word used in every promotional campaign." *Johanns*, 544 U.S. at 561, 125 S.Ct. 2055. Promotional campaigns by QSBCs and contracted third parties subject to the Secretary's pre-approval are therefore plainly government speech.

3  QSBCs have submitted thousands of approval requests to the AMS. For example, the Texas QSBC has made more than 650 submissions, and it may take days or weeks before a final product is approved.

4  In 2018 and 2019, the AMS reviewed about 155 QSBC contracts.

Third-party speech not subject to pre-approval is also "effectively controlled" by the government. Congress expressly contemplated the participation of third parties in the beef checkoff program, designating several "established national nonprofit industry-governed organizations" with whom the Operating Committee could contract to "implement programs of promotion." 7 U.S.C. § 2904(6).[5] The Supreme Court upheld that program despite recognizing the presence of "assistance from nongovernmental sources in developing" advertising. *Johanns*, 544 U.S. at 562, 125 S.Ct. 2055.

5  Most of the third-party funding goes to two advocacy organizations—the Federation Division of the National Cattleman's Beef Association ("Federation") and the United States Meat Export Federation ("USMEF")—with established relationships with the Beef Board. Congress gave the Federation an express role in the beef checkoff program, authorizing it to elect members of the Operating Committee, 7 U.S.C. § 2904(4) (A), and directing the Operating Committee to "enter into contracts or agreements ... with established national nonprofit industry-governed organizations, including the federation ... to implement programs of promotion, research, consumer information, and industry information," 7 U.S.C. § 2904(6).

*Paramount Land* vacated a preliminary injunction in a similar program despite the Pistachio Commission's use of funds from assessments to pay "a political consultant who hires lawyers to represent the industry before the International Trade Commission and the Commerce Department, and to lobby government entities on behalf of the pistachio industry." 491 F.3d at 1007. We treated the third-party speech as that of the Commission because the "message set out in the pistachio promotions is from beginning to end the message established by the state government." *Id.* at 1012 (cleaned up).

Here, too, the message is firmly established by the federal government. The Beef Act's implementing regulations require that all third-party speech "strengthen the beef industry's

position in the marketplace," and not mention "brand or trade" names, engage in "unfair or deceptive acts or practices," or seek to influence "governmental policy or action." 7 C.F.R. § 1260.169(a), (d), (e). QSBCs must submit annual budget and marketing proposals for the Secretary's approval that contain "anticipated expenses and disbursements" and "a general description of the proposed promotion ... programs contemplated." In addition, the QSBCs must give the Secretary advance notice of all board meetings, allowing participation by the Secretary or his designees in any discussions about payments to third parties.[6]

[6]  Defendants also argue that the opt-out scheme cures any First Amendment concern. Because we hold that the government effectively controls the speech at issue, we do not reach this issue.

R-CALF argues that such safeguards are insufficient because the government does not exercise final pre-approval authority over some third-party speech. But in *Paramount Land*, we found dispositive the government's *ability* to control speech, even when it declined to do so. See 491 F.3d at 1011–12. Here, the Secretary clearly has that authority. In addition to the oversight previously mentioned, the Secretary has unquestioned control of the flow of assessment funds to the QSBCs—and the threat of decertification under the MOUs and the regulations if he disapproves of the use of those funds. See 7 C.F.R. § 1260.181(a) (providing for certification, and, impliedly, decertification of QSBCs by the Beef Board); *see also id.* § 1260.213 (providing for the removal of Beef Board members by the Secretary). "Just as 'the Secretary of Agriculture does not write the copy of the beef advertisements himself' for the Beef Board, neither should such oversight be required for the [ ] scheme to pass constitutional muster." *Paramount Land*, 491 F.3d at 1012 (quoting *Johanns*, 544 U.S. at 560, 125 S.Ct. 2055) (cleaned up). A contrary holding here "risks micro-managing legislative and regulatory schemes, a task federal courts are ill-equipped to undertake." *Id.* at 1012.[7]

[7]  R-CALF also argues that the QSBCs must have at least some members appointed and removable by the Secretary for the speech to constitute government speech. But the Secretary's ability to decertify a QSBC—which has been previously exercised—provides even greater oversight than the limited removal authority this Court has cited

in other cases. See *Delano Farms*, 586 F.3d at 1229 (noting the State's power to remove individual members of the Table Grape Commission and to recommend that producers suspend the Commission's operation); *Paramount Land*, 491 F.3d at 1011 (noting that while the Secretary cannot remove members of the Pistachio Commission, she may "suspend or discharge the Commission's president if he has engaged in any conduct that the Secretary determines is not in the public interest," or "correct or cease any existing activity or function that is determined by the [S]ecretary not to be in the public interest or in violation of the Pistachio Act") (cleaned up).

We therefore affirm the summary judgment of the district court.

## IV

Even if the underlying summary judgment is affirmed, R-CALF nonetheless argues that the district court should have entered a permanent injunction requiring the continuation of the MOUs to prevent the risk that the current policy will be undone. The district court determined that no injunction was needed because the MOUs mooted R-CALF's entitlement to relief and no exception to mootness applied.

[7]  [8]  [9]  "It is well-established ... that 'voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case' unless 'it can be said with assurance that there is no reasonable expectation that the alleged violation will recur' and 'interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.' " *Fikre v. FBI*, 904 F.3d 1033, 1037 (9th Cir. 2018) (cleaned up) (quoting *Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979)). The government receives greater deference than private parties when courts analyze voluntary cessation. See *Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010) (collecting cases). But the government "must still demonstrate that the change in its behavior is entrenched or permanent." *Fikre*, 904 F.3d at 1037 (cleaned up). It must be "absolutely clear to the court, considering the procedural safeguards insulating the new state of affairs from arbitrary reversal and the government's rationale for its changed practices, that the

21 Cal. Daily Op. Serv. 7548, 2021 Daily Journal D.A.R. 7584

activity complained of will not reoccur." *Id.* at 1039 (cleaned up).

 **[10]**  **[11]**  The government has met that burden here. To be sure, the MOUs are revocable. And, the Secretary entered into the first MOU only after the magistrate judge recommended a preliminarily injunction in this case. But, over five years have now passed since the Secretary first entered into the MOUs to document the Department's control of the use of checkoff funds—including with QSBCs not named in this litigation. *See Am. Diabetes Ass'n,* 938 F.3d at 1153 (finding two years of policy weighs in favor of mootness). And the MOUs remain binding unless both parties agree to rescind them, providing safeguard from arbitrary reversal. *See Fikre,* 904 F.3d at 1039. Under these circumstances, the MOUs are an "entrenched" change in the prior status quo, and the district court did not err, in the absence of any evidence that the Secretary intends to withdraw from the MOUs, in declining to enter a permanent injunction requiring him not to. [8]

[8]

We also reject R-CALF's cursory argument that the MOUs are unlikely to remain in place because they did not go through notice and comment. Even assuming that R-CALF preserved this argument by raising it below, an MOU is not a legislative rule for which notice and comment is required. *See, e.g.,* *Perez v. Mortg. Bankers Ass'n,* 575 U.S. 92, 102, 135 S.Ct. 1199, 191 L.Ed.2d 186 (2015); *Hemp Indus. Ass'n v. Drug Enf't Admin.,* 333 F.3d 1082, 1087 (9th Cir. 2003).

**AFFIRMED**.

## All Citations

6 F.4th 983, 21 Cal. Daily Op. Serv. 7548, 2021 Daily Journal D.A.R. 7584

---

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.